KANDYTHE J. LIEPELT, Adm'r of the Estate of Delroy Liepelt, Deceased, Plaintiff-Appellee, *v.* NORFOLK AND WESTERN RAILWAY COMPANY, Defendant-Appellant.

First District (1st Division)   No. 77-677

Opinion filed July 5, 1978.

654

Charles F. White, Robert L. Landess, and Tobin M. Richter, all of Chicago (Ross, Hardies, O'Keefe, Babcock & Parsons, of counsel), for appellant.

Karlin & Fleisher, of Chicago (Sidney Z. Karasik and Gary E. Dienstag, of counsel), for appellee.

Baker & McKenzie, of Chicago (Francis D. Morrissey and John T. Rank, of counsel), for *amici curiae* The Atchison, Topeka and Santa Fe Railway Company, The Belt Railway Company of Chicago, Burlington Northern, Chessie System and Chicago, Milwaukee, St. Paul and Pacific Railroad Company.

Edward J. Kionka, of Carbondale, and Edward I. Pollock, of Los Angeles, California, for *amicus curiae* The Association of Trial Lawyers of America.

Mr. PRESIDING JUSTICE GOLDBERG delivered the opinion of the court:

Kandythe Liepelt (plaintiff), as administrator of the estate of her husband, Delroy Liepelt, deceased, brought this action under the Federal Employers' Liability Act to recover damages from his employer, Norfolk and Western Railway Company (defendant), for his death in the course of duty. A jury awarded plaintiff $775,000. Defendant appeals.

Defendant contends that the trial court erred: in denying defendant's motion to dismiss the action on the ground of *forum non conveniens*; in allowing the jury to consider an Indiana statute as evidence of negligence since that statute had been preempted by Federal action; in directing a verdict for plaintiff on the issue of contributory negligence; in refusing its instructions on sole proximate cause; in deeming certain facts admitted and in prohibiting the defendant from explaining those facts at trial; in refusing to allow the jury to consider the impact of Federal income taxation on the issue of damages; in instructing the jury that it could award damages for loss of care and guidance for the children of the deceased when no evidence of the value of these services was presented; and that the damages are excessive.

The evidence shows that on November 22, 1973, the decedent was working as a fireman on a freight train owned and operated by the defendant. On that day, decedent was on board defendant's train, Extra 2917, travelling from Montpelier, Ohio, to Chicago. The train was made up of 140 cars and was approximately 1½ to 2 miles long. It was pulled by three diesel locomotives. The decedent rode in the cab of the lead locomotive with the engineer, Owen Perkins. The decedent sat on the left side of the cab and Perkins sat on the right. The remaining members of the crew were Macadoo Maynard and Terry Northrup, brakemen; Clayton Manly, flagman, and Roger Shepard, conductor. Maynard and

Northrup rode in the second locomotive and Manly and Shepard rode in the caboose.

Defendant's rules require that whenever a third seat is available in the lead locomotive a brakeman is required to ride there. One of his duties is to act as an additional lookout. There was no third seat available in the lead locomotive of Extra 2917. Decedent and the engineer were alone in the cab.

The entire train had been inspected by defendant's personnel before it left Montpelier. It was found to be in good condition. However, there is testimony that all three diesel locomotives "were old and worn out." The diesel engines operate an air compressor which supplies air pressure to operate the brakes. At the head of the train the pressure was approximately 75 pounds. At the rear of the train the pressure dropped off. A minimum of 60 pounds is required throughout the train for the brakes to operate effectively. Shortly prior to the occurrence Perkins, the engineer, had radioed the caboose concerning "trouble with the air."

Each locomotive has two 200-watt headlights. The beams from these lights must be capable of illuminating the image of a man at least 800 feet in front of the train. There is evidence that the fireman, as well as the engineer, has a duty to keep a lookout as the train proceeds. Levers for applying the brakes are at the right of the cab in front of the engineer. The fireman also has an emergency brake lever on his side of the cab.

The track on which Extra 2917 travelled is a single, main line, maintained and operated by the defendant. In order for two trains travelling in opposite directions to pass each other it is necessary for one of them to enter a parallel track, called a "siding" or "passing track." The train on the passing track is obliged to wait until the other train has passed before reentering the main track. Entry to these sidings is made possible by a switch at either end of the siding. The switch must be opened manually to permit entry to the siding from the main track.

Between Montpelier and Chicago one such siding is located near Wyatt, Indiana. This siding runs east/west for approximately 4000 feet. It is immediately to the south of the main line track. In addition to being used as a passing track, this siding is connected to an auxiliary track called a "spur." This spur runs adjacent to a grain elevator, enabling grain cars (hopper cars) to be positioned directly under the elevator for loading.

The defendant's rules prohibit the storing of cars on a siding unless "authorized by the superintendent or in emergency. When so obstructed, the train dispatcher must be notified." On November 22, 1973, the siding at Wyatt contained seven loaded hopper cars weighing 690 tons. No authorization had been issued and no emergency existed. The defendant's dispatcher in Montpelier stated that he was aware the Wyatt siding was used to store loaded hopper cars during the busy season. The cars were

positioned so that their eastern most end was 198 feet west of the east switch. Thus, there were 198 feet of track separating the east end of these parked hopper cars and the main track.

All switches are equipped with a position indicator or banner from which the train operators can determine whether the switch is open or closed. The testimony concerning the number of banners employed on the east switch at Wyatt is somewhat contradictory. However, it appears from the exhibits and the testimony of Maynard, a brakeman, that the signal consisted of two aluminum banners positioned one above the other on a pole over the switch. The top banner was oblong, 15½ inches wide and 6 inches high. It was covered with red reflectorized paint and stood approximately 7 to 9 feet in the air. The lower banner was 15 inches square and was also red, though not reflectorized.

Both banners faced in the same direction. When the switch was closed the banners would be parallel to the main track and therefore not visible to trains approaching on that track. When the switch was open the banners would turn to face trains approaching from the east. A red signal, therefore, indicated that the switch was open.

There was testimony that the banners on the east switch were dirty from smoke and dust. Maynard testified that he visited the site of the occurrence "a couple of days" thereafter. The banners were "really dirty" and, in daylight, they could hardly be seen from a distance of 700 feet. The banners had also been partially damaged, apparently by shotgun blasts. Northrup, a brakeman, testified that there were high weeds and brush in the area which made the switch position indicators "hard to see."

The switch itself was padlocked. The lock could not be located the night of the occurrence but was found the following day in a ditch adjoining the track. The lock was jammed in a partially open position and bore marks of an attempt to force it open. The switch itself had been opened and the red banners were facing the westbound traffic. A witness for the defendant testified that he had operated the switch some 3 days prior to the occurrence and found both the lock and the switch to be in good working order. He had locked the switch after its use.

The track in the immediate area of the occurrence was described by witnesses as "rough" and "run down." The ties "were in bad condition" and "many or most" of them were "old, rotten, splitting and cracked." Many spikes were loose. The ballast, which is made up of crushed stone and covers the ties, was in poor condition causing the train to rock "severely" from side to side. The speed limit on this stretch of track had been reduced from 50 to 40 miles per hour.

Defendant's track supervisor testified that he inspected the track the day after the occurrence and took no exception to the condition of the track or the visibility of the signal. A brakeman employed by defendant

stated that he found no vegetation in the area of the switch when he operated it 3 days prior to the occurrence.

As Extra 2917 approached the Wyatt siding, it was travelling at approximately 32-37 miles per hour. It was early evening, between 5:30 and 6 p.m. There was little light except for a faint glow in the western sky. Terry Northrup, a brakeman, testified that he heard the brakes go into emergency operation. He saw the first locomotive veer sharply to the left and then saw 7 or 8 hopper cars directly in front of it. There was a terrible crash. At the moment of impact the train was travelling at approximately 30 miles per hour. The first hopper car was forced on top of the lead locomotive, shearing the cab. The decedent and the engineer were killed instantly.

The trial court denied defendant's motion to dismiss based upon *forum non conveniens*. Defendant is a Virginia corporation with its principal office in that State. It conducts business in Illinois only as a part of its line running from various points in Ohio to Chicago. The decedent lived in Ohio and his estate is being probated there. The occurrence took place near Wyatt, Indiana, some 90 miles from Chicago.

Defendant's motion was properly supported by affidavit. The affidavit showed that the proposed witnesses lived in Ohio, Indiana, Michigan or Virginia. No occurrence witnesses lived in Illinois. Defendant shows in its brief that 21 witnesses testified of which only 2 lived in Illinois. All other witnesses were obliged to travel to Chicago.

Plaintiff filed an answer to the motion attacking its sufficiency and asserting her right to choice of forum and to trial counsel practicing there. Briefs were filed in the trial court by both sides.

In our opinion, this issue is decided by *Saunders v. Norfolk & Western Ry. Co.* (1977), 54 Ill. App. 3d 307, 369 N.E.2d 518. That case presents many facts which coincide with the situation at bar and the doctrine of *forum non conveniens* is given comprehensive treatment. (*Saunders*, 54 Ill. App. 3d 307, 309-12.) It is unnecessary for us to repeat the principles and authorities noted there.

It is sufficient for us to note that although the States have power to apply the doctrine of *forum non conveniens* to actions arising under the Federal Employers' Liability Act, there are strong considerations of policy which confer on plaintiffs in these cases the right and privilege to choose any forum in which the defendant railway is doing business. Furthermore, "the trial court's decision on the motion will be overturned only if the reviewing court finds an abuse of discretion." *Saunders*, 54 Ill. App. 3d 307, 311.

■■ Attempting to weigh and balance all of the factors on both sides, we conclude that the trial court did not abuse its discretion in denying the motion. This result is supported by a review of the record in this case. Able counsel for the defendant presented a spirited and thorough

defense. We cannot find any evidence of handicaps or problems arising which hampered the defense because of the choice of forum. We approve the ruling of the trial court in this regard.

The second issue raised by defendant concerns the doctrine of Federal preemption. (U.S. Const., art. VI, cl. 2.) At the time of this occurrence, section 1 of the Indiana Switch Light Act (Ind. Code §8—8—10—1 (Burns 1976) (amended 1977, P.L. 106, §2)), read:

> "Every steam railroad company operating wholly or partly in the state of Indiana shall place and maintain upon each switch in said state that is connected with the main track a signal light, attached in such manner to the moving panel of such switch that it will indicate safety when such switch is set to such main track, and that will indicate danger when such switch is not set to the main track. Said light shall be kept brightly burning constantly between the hours of sunset and sunrise, and on such days or parts of days as are dark and foggy."

At trial, plaintiff was allowed to introduce the existence of the Switch Light Act over defendant's objection. Also, as we will later discuss, the trial court included this act in one of the jury instructions.

In 1970, Congress passed the Federal Railroad Safety Act (45 U.S.C. §§421-441 (1970)) (FRSA). Under the FRSA the Secretary of Transportation (Secretary) is authorized to promulgate rules, regulations and standards for all areas of railroad safety. (45 U.S.C. §431 (1970).) Section 205 of the FRSA (45 U.S.C. §434 (1970)), concerns the preemption of State laws. That section reads:

> "The Congress declares that laws, rules, regulations, orders, and standards relating to railroad safety shall be nationally uniform to the extent practicable. A State may adopt or continue in force any law, rule, regulation, order, or standard relating to railroad safety until such time as the Secretary has adopted a rule, regulation, order, or standard covering the subject matter of such State requirement. A State may adopt or continue in force an additional or more stringent law, rule, regulation, order, or standard relating to railroad safety when necessary to eliminate or reduce an essentially local safety hazard, and when not incompatible with any Federal law, rule, regulation, order, or standard, and when not creating an undue burden on interstate commerce."

The Secretary adopted a series of rules on track safety standards. (49 C.F.R. §213 (1976).) Standard 213.135 is entitled "Switches." It contains performance standards for eight distinct aspects of a switch. Subpart (g) of Standard 213.135 states, "[e]ach switch position indicator must be clearly visible at all times." There is no specification of the type of indicator that is to be used.

The doctrine of preemption has been the subject of two recent United

States Supreme Court decisions. (*Ray v. Atlantic Richfield Co.* (1978), 435 U.S. 151, 55 L. Ed. 2d 179, 98 S. Ct. 988; *Jones v. Rath Packing Co.* (1977), 430 U.S. 519, 51 L. Ed. 2d 604, 97 S. Ct. 1305.) In both of these cases the court began its analysis of the preemption issue " 'with the assumption that the historic police powers of the States were not to be superseded by the Federal Ac⁺ unless that was the clear and manifest purpose of Congress.' " (*Ray*, 435 U.S. 151, 157, 55 L. Ed. 2d 179, 188, 98 S. Ct. 988, 944; *Jones*, 430 U.S. 519, 525, 51 L. Ed. 2d 604, 614, 97 S. Ct. 1305, 1309, both quoting from *Rice v. Santa Fe Elevator Corp.* (1947), 331 U.S. 218, 230, 91 L. Ed. 1447, 1459, 67 S. Ct. 1146.) In *Ray*, the court further stated that the congressional purpose may be evidenced in a number of ways, one being where the " 'scheme of federal regulation [is] so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it.' " (435 U.S. 151, 157, 55 L. Ed. 2d 179, 188, 98 S. Ct. 988, 994, quoting from *Rice*, 331 U.S. 218, 230, 91 L. Ed. 1447, 67 S. Ct. 1146, 1152.) Both *Ray* and *Jones* point out that even where a particular area is not totally foreclosed to the States, no State law may stand where it would be impossible to comply with both the State and Federal regulations of where the State law would frustrate the Congressional purpose. *Ray*, 435 U.S. 151, 157, 55 L. Ed. 2d 179, 188, 98 S. Ct. 988, 994; *Jones*, 430 U.S. 519, 525-26, 51 L. Ed. 2d 604, 614, 97 S. Ct. 1305, 1309.

In the present case we are faced with the explicit declaration of Congress that no State rail safety law shall remain valid after promulgation of a Federal regulation covering the same subject matter as that covered by the State law. (45 U.S.C. §434 (1970).) The limited exception for purely local safety hazards has not been claimed to apply to the Indiana statute. Therefore, the narrow question with which we are faced·is whether the Switch Light Act and Standard 213.135(g) cover the same subject matter.

On its face Standard 213.135(g) simply imposes a general requirement of visibility for ʻswitch position indicators. It does not specify the type of indicator that must be used nor does it indicate any design specifications that must be followed.

Thus, in many respects this case is similar to *Chrysler Corp. v. Tofany* (2d Cir. 1969), 419 F.2d 499. That case concerned the National Traffic and Motor Vehicle Safety Act of 1966 (15 U.S.C. §§1381-1431 (1970) (Traffic Safety Act)), and Federal Motor Vehicle Safety Standard No. 108 (49 C.F.R. §371.21 (1969)).[1] Paragraph S3.1.2[2] of Standard 108 provided that "[n]o additional lamp, * * * shall be installed [on an automobile] if it impairs the effectiveness of the required equipment."

---

[1] Standard No. 108 has been recodified and amended as 49 C.F.R. §571.108 (1976).

[2] Paragraph S3.1.2 has been redesignated and amended as paragraph S4.1.3 (1976).

In 1969, Chrysler sought to introduce an additional headlamp, which it called "Super Lite," as optional equipment on certain models of its Dodge line of automobiles. Prior to doing so it had obtained assurance from the National Highway Safety Bureau that the addition of Super Lite did not violate Standard 108. Officials of the States of New York and Vermont, however, sought to prevent the sale in their States of Dodge automobiles equipped with Super Lite. Chrysler objected on the ground that section 103(d) of the Traffic Safety Act (15 U.S.C. §1392(d) (1970)), precluded all States from enacting auto safety standards which were not identical to existing Federal standards covering the same "aspect of performance." Chrysler argued that Standard 108, paragraph S3.1.2 covered the same aspect of performance as the officials of New York and Vermont wished to regulate. Chrysler also argued that the Congressional objective sought to be attained by the passage of the Traffic Safety Act was national uniformity of auto safety standards and that this objective would be defeated by allowing New York and Vermont to set their own standards in regard to Super Lite.

The Second Circuit held that the purpose of the Traffic Safety Act was to promote highway safety and that nationally uniform safety standards were a means to that end rather than the end itself. (*Tofany*, 419 F.2d 499, 508.) The court felt the need to construe the aspect of performance clause narrowly so as to provide States the opportunity to regulate new products that might be placed on the market before the Federal agency had time to certify their safety. The court therefore concluded that paragraph S3.1.2 of Standard 108 covered a different aspect of performance than the standards of New York and Vermont. Accordingly the court held that the State regulations were not preempted by the Traffic Safety Act. *Tofany*, 419 F.2d 499, 511.

Similar reasoning can be applied to the facts before us. Section 101 of the FRSA declares the purpose of that Act to be: "to promote safety in all areas of railroad operations and to reduce railroad-related accidents, and to reduce deaths and injuries to persons * * *." (45 U.S.C. §421 (1970).) Although Congress was also concerned with national uniformity of railroad safety standards, the primary legislative concern was safety. In the case before us, as in *Tofany*, a narrow construction of the coverage of the preemption provision will aid in achieving safety by enabling the States to continue in force regulations covering aspects of rail safety not yet covered by the Secretary's regulations.

Standard 213.135(g), the Federal regulation before us, is concerned only with visibility, while the Switch Light Act covers indicator design. The Secretary, while authorized to go further in his regulation of rail switches, has chosen not to do so. There may come a time when the Secretary will choose to enact detailed specifications on all aspects of rail

switches in which event the State laws on this subject must give way. "But it will be time to consider such asserted conflicts between the State and Federal Acts when and if they arise. Any such objections are at this stage premature." *Rice,* 331 U.S. 218, 237, 91 L. Ed. 2d 1447, 1463, 67 S. Ct. 1146.

Considerations of time and space make it impossible for us to comment upon each of the many authorities cited on this issue by defendant and the *amici* railroads. We will, however, comment upon the authorities which we regard as those upon which greatest reliance is placed.

*Donelon v. New Orleans Terminal Co.* (5th Cir. 1973), 474 F.2d 1108, *cert. denied* (1973), 414 U.S. 855, 38 L. Ed. 2d 105, 94 S. Ct. 157, concerned an attempt by local parish officials to regulate railroad safety. The finding of preemption in that case was limited to preemption of *local* government regulation. The question of the preemptive effect of the FRSA on State legislation was expressly reserved. 474 F.2d 1108, 1113.

*National Association of Regulatory Utility Commissioners v. Coleman* (3d Cir. 1976), 542 F.2d 11, involved the standards for reporting railroad accidents. (49 C.F.R. §225 (1976).) The court held that the States were preempted from adopting their own reporting systems. There, however, the Federal standards were very specific in their requirements, unlike the general Federal standard on switches involved here. In addition, the Secretary expressly stated in Standard 225.1 of the accident reporting standards that the issuance of the Federal reporting requirements "preempts States from prescribing accident/incident reporting requirements." (49 C.F.R. §225.1 (1976).) The absence of any corresponding language in the Track Safety Standards indicates that the Secretary recognized that these standards did not cover all possible aspects of track safety.

This is further evidenced by Track Safety Standard 213.1 which states that this section contains initial minimum standards covering isolated track conditions. "[A] combination of track conditions, none of which individually amounts to a deviation from the requirements in this part, may require remedial action to provide for safe operations over that track." (49 C.F.R. §213.1 (1976).) This language indicates to us that the Secretary not only contemplated but encouraged remedial State action in certain areas of rail safety.

■■ We conclude, therefore, that Standard 213.135(g) does not cover the same subject matter as covered by the Switch Light Act and that the latter was not preempted by the former. Consequently, the trial court committed no error in receiving evidence of the Switch Light Act.

Defendant also contends that the trial court erred in reading section 3 of the Switch Light Act to the jury. Section 3 provided for liability for

violation of the Act (Ind. Code §8—8—10—3 (Burns 1976) (repealed 1977, P.L. 106, §3)):

"For any violation of or failure to comply with any of the provisions of this act such company shall be liable to all persons and employees injured by reason thereof, and no employee shall, in any case be held to have assumed the risk incurred by reason of such violation or failure."

The defendant contends that this was error in that the FELA preempts section 3 of the Switch Light Act. It cites *Seaboard Air Line Ry. v. Horton* (1914), 233 U.S. 492, 58 L. Ed. 1062, 34 S. Ct. 635, in support thereof.

Also, the trial court instructed the jury that if it found the defendant "violated the [Act] on the occasion in question, then [it could] consider that fact together with all the other facts and circumstances in evidence in determining whether or not [the defendant] was negligent before and at the time of the occurrence." (From Illinois Pattern Jury Instructions, Civil, No. 60.01 (2d ed. 1971) (hereinafter cited as IPI Civil).) The defendant claims, citing *Northern Trust Co. v. Chicago Rys. Co.* (1925), 318 Ill. 402, 149 N.E. 422, that it was reversible error to read the preempted portion of the statute to the jury coupled with an instruction that the jury could consider the void statute as a basis for liability.

We agree with defendant that the FELA has preempted the liability portion of the Switch Light Act. However, in our opinion, the defendant's reliance on *Northern Trust* is misplaced. That case held that it was reversible error to cite a void statute to the jury coupled with a peremptory instruction. (318 Ill. 402, 414.) A peremptory instruction is one "given by a court to a jury, which the latter must obey implicitly, as an instruction to return a verdict for the defendant, or for the plaintiff, as the case may be." (*Martin v. Kralis Poultry Co.* (1973), 12 Ill. App. 3d 453, 466-67, 297 N.E.2d 610.) In the present case, no peremptory instruction was given on this point. The judge merely instructed the jury that it might consider section 3 along with "all the other facts and circumstances in evidence in determining whether or not [the defendant] was negligent * * *." IPI Civil No. 60.01.

■■ Furthermore, it is evident from the pleadings that the plaintiff brought her action under the FELA. The trial judge instructed the jury on the issue of liability by reading to them the Illinois Pattern Instruction on liability in FELA cases. (IPI Civil No. 160.02.) We do not believe that by reading section 3 to the jury the trial judge erroneously led the jury to believe that liability could be based on that section rather than on the FELA. Therefore, even if it was error to cite the preempted section of the statute to the jury, the error was harmless.

The next point raised by defendant concerns the trial court's action in

directing a verdict for plaintiff on the issue of contributory negligence. Under the FELA a finding of contributory negligence does not bar recovery as it would in an ordinary negligence action. If the jury makes a finding of contributory negligence, it is required to reduce the damages in proportion to the degree of negligence attributable to the injured party. (45 U.S.C. §53 (1970).) Also, under the FELA, the burden of establishing contributory negligence is on the defendant. (*Fisher v. Chicago, Rock Island & Pacific Ry. Co.* (1919), 290 Ill. 49, 56, 124 N.E. 831.) "In FELA cases there is a presumption that the deceased was engaged in the performance of his duty and exercised due care for his own safety at the time of his death." *Moore v. Atchison, Topeka & Santa Fe Ry. Co.* (1960), 28 Ill. App. 2d 340, 355, 171 N.E.2d 393.

The evidence relied on by the defendant to show contributory negligence consists of the results obtained from a reenactment of the accident conducted 6 days later by employees of the defendant. The results of these tests were made the subject of requests for admissions which plaintiff served on defendant. The tests showed:

(1) At a point 2,879 feet east of the east end switch the reflectorized banner was barely visible;

(2) At a point 1,777 feet east of the east end switch the reflectorized banner was distinctly visible;

(3) At a point 966 feet east of the east end switch, in the opinion of the observers, the engineer of Extra 2917 would have realized something was definitely wrong and would have placed the train brakes in emergency;

(4) Under normal conditions, Extra 2917 would have been stopped by emergency application of the air brakes in 1,478 feet;

(5) The loaded hopper cars were parked on the siding 198 feet west of the east switch;

(6) The brakes of Extra 2917 were not applied until 569 feet east of the switch.

The defendant also points to evidence that the decedent had a duty to maintain a lookout and to apply the emergency brakes if necessary. One of the emergency brake levers was located on decedent's side of the cab.

The trial judge, however, had much more evidence to consider in deciding this issue. There was testimony by the flagman, Clayton Manly, that the track near Wyatt was "rough and not [in] too good a shape." Terry Northrup, a brakeman, testified that this condition caused a rocking motion and made braking more difficult than on a smooth, well-kept roadbed. Clayton Manly further stated that 15 or 20 minutes prior to the accident the engineer called him and complained of "having trouble with the air." This condition would also affect the braking ability of the train.

■■ Also there was testimony by at least two witnesses that the banners

on the switch were dirty from dust and smoke and there were high weeds and bushes near the switch which made the banners difficult to see. Furthermore, the decedent was not primarily responsible for keeping a lookout. As a fireman he was required to keep a lookout only when he was not preoccupied with other duties. It was the engineer who was primarily responsible for operating the train. The decedent had a right to rely on proper performance of this duty by the engineer particularly while the decedent was occupied with his other duties. *Knierim v. Erie Lackawanna R.R. Co.* (2d Cir. 1970), 424 F.2d 745, 747.

In *Taylor v. Atchison, Topeka & Santa Fe Ry. Co.* (1937), 292 Ill. App. 457, 465-66, 11 N.E.2d 610, *cert. denied* (1938), 304 U.S. 560, 82 L. Ed. 1528, the court stated:

> "The fireman is merely an assistant acting under the direction of the engineer, and from the character of his duties in keeping up steam by firing, it cannot be said that it is his paramount duty to be on the lookout all the time. As was said in *St. Louis & S. F. R. Co. v. Bishard*, 147 Fed. 496, 'Other duties of moment may have demanded his attention elsewhere.' "

Firemen are no longer required to shovel coal to maintain steam, but there are other duties which demand their attention. Terry Northrup testified that about an hour before the accident the decedent left the lead locomotive to inspect the electrical systems of the second and third locomotives. Northrup stated that there was an inadequate amount of electricity to power the drive wheels and that the cab and instrument lights were dim. Decedent made an effort to correct this situation but, according to Northrup, the condition persisted up to the time of the accident. In addition to the electrical problem, there was testimony from Clayton Manly, flagman in the caboose, that the engineer contacted him concerning trouble with the air pressure about 15 to 20 minutes prior to the accident.

■■ Viewing the evidence as a whole, it is impossible to determine exactly what the decedent was doing immediately prior to the accident. However, the evidence strongly suggests that the decedent was occupied with at least two mechanical problems and was therefore unable to maintain a lookout. The defendant did not carry its burden of presenting any evidence to negate this inference and therefore any contrary conclusion would necessarily be pure speculation and conjecture. A finding of negligence cannot be based on such tenuous grounds. (*Tompkins v. Twin Oaks Dairy, Inc.* (1968), 91 Ill. App. 2d 88, 94, 234 N.E.2d 403, *appeal denied* (1968), 38 Ill. 2d 630.) Reviewing all of the evidence presented we conclude the trial court was correct in directing a verdict on the issue of contributory negligence.

Defendant raises an issue on refusal of the trial court to give defendant's tendered instruction on proximate cause. Defendant tendered IPI Civil No. 12.04 (2d ed. 1971) which states:

"More than one person may be to blame for causing an injury. If you decide that the defendant was negligent and that his negligence was a proximate cause of injury to the plaintiff, it is not a defense that some third person who is not a party to the suit may also have been to blame.

[However, if you decide that the sole proximate cause of injury to the plaintiff was the conduct of some person other than the defendant, then your verdict should be for the defendant.]"

The trial court rejected this instruction and gave plaintiff's version of No. 12.04 which omitted the bracketed language. The defendant claims that the trial court thus precluded it from having the jury instructed on one of its theories of the case, namely that the sole cause of the accident was the conduct of some third person who broke the switch lock and threw the switch.

The Notes on Use accompanying IPI Civil No. 12.04 (2d ed. 1971) state that the bracketed language "should be used only where there is evidence tending to show that the sole proximate cause of the occurrence was the conduct of a third person."

■■ Even if we assume *arguendo* that there was sufficient evidence to show that an unrelated third party broke the lock and tampered with the switch, the defendant still could not claim that this was the sole proximate cause of the accident. Defendant parked seven loaded hopper cars on the Wyatt siding in violation of its own rules and failed to notify the crew of Extra 2917 of this fact. Thus, despite other evidence adduced by plaintiff regarding other possible proximate causation, the evidence shows that if the hopper cars had not been parked on the siding the mishap would not have occurred. The defendant's conduct in failing to keep the siding clear of obstruction and in failing to notify the crew of Extra 2917 of the obstruction created reasonably foreseeable dangers. The record demonstrates that the intervening act of a third party was not the sole cause of the accident. (See *Drell v. American National Bank & Trust Co.* (1965), 57 Ill. App. 2d 129, 139, 207 N.E.2d 101.) The jury was properly instructed in this regard.

Defendant next urges error in the trial court in ruling that the plaintiff's requests to admit certain matters were deemed admitted because of defendant's improper responses. Prior to trial, on December 1, 1975, the plaintiff served upon defendant a request for admissions of certain facts pursuant to Supreme Court Rule 216. (Ill. Rev. Stat. 1975, ch. 110A, par. 216.) The facts sought to be admitted were those obtained by the defendant as a result of its investigation of the accident. An investigation

was also conducted by the Federal Railroad Safety Board (FRSB) and certain of the facts sought to be admitted were contained in the FRSB report.

The plaintiff moved to strike the defendant's initial responses because they did not contain the detailed answers required by Rule 216(c). (Ill. Rev. Stat. 1975, ch. 110A, par. 216(c).) The defendant withdrew these responses and filed a second set on March 15, 1976. Nothing further was done concerning these responses until November 16, 1976, the second day of trial, at which time the trial court granted plaintiff's motion to declare the matters contained in five of the requests as admitted by defendant because of defendant's failure to give proper responses.

Rule 216(c) provides in part:

> "Each of the matters of fact * * * of which admission is requested is admitted unless, within 28 days after service thereof, the party to whom the request is directed serves upon the party requesting the admission either (1) a sworn statement denying specifically the matters of which admission is requested or setting forth in detail the reasons why he cannot truthfully admit or deny those matters or (2) written objections on the ground that some or all of the requested admissions are privileged or irrelevant or that the request is otherwise improper in whole or in part."

The defendant did not deny or object to the plaintiff's requests, therefore it was incumbent upon defendant to set forth in detail the reasons it could not admit or deny the matters. This it failed to do.

■■ In *Banks v. United Insurance Co. of America* (1975), 28 Ill. App. 3d 60, 328 N.E.2d 167, this court stated that "[u]nless the party, to whom a notice to admit is directed, conforms his response to the framework provided by the Rule, * * *" the requested matters are admitted.

In the case before us, the defendant began its investigation immediately after the accident occurred, almost 3 years prior to trial. Its employees had performed numerous observation tests the results of which were readily available to it. Yet in spite of this the defendant continued to maintain at all material times that it could not admit these matters because its investigation was not completed.

Actually, the facts sought consisted of basic measurements, weights, braking distances, equipment used and results of the observation tests. The defendant's response to each of these requests was that its investigation was not complete and therefore it had "insufficient information to admit or deny the facts set forth * * *." The contention that these matters were not in the defendant's knowledge is incomprehensible. One of the requests asked the defendant to admit the stopping distance of Extra 2917 which fact had been stated in the FRSB report. Another request sought the admission of the results of defendant's

observation tests which were also contained in the FRSB report. Still another request asked the defendant to admit that it did not have a derail device on the passing track at Wyatt. Each of these facts was within the defendant's knowledge.

■■ We conclude that the defendant failed to conform its responses to Rule 216(c) and therefore the requested matters were properly admitted.

In its brief, defendant urges that the court erred in excluding additional testimony from Charles Bagby, defendant's engineer who had conducted the tests above described. The first point raised is an attempt to modify the distance stated in the tests above described as to the point at which the emergency brakes of the train should have been applied. As above shown, this was an improper attempt by defendant to modify its response to the admissions of fact. (*West Central Utilities Service Co. v. Central Illinois Public Service Co.* (1976), 42 Ill. App. 3d 5, 355 N.E.2d 349, *appeal denied* (1977), 65 Ill. 2d 580.) Secondly, defendant urges in its brief that the court erred in excluding evidence by the engineer regarding the distance from the point of impact at which the normal braking capacity of the engine should have been exerted. However, without considering the importance of this point, if any, we reject this contention. The record shows that defendant made no offer of proof in this regard. We find no indication in this record that the court would have prevented the engineer from testifying about this matter. The court simply excluded testimony from the witness regarding matters already admitted. Thus, the question sought to be raised by defendant regarding application of the ordinary brakes was never presented to the witness or to the court.

Defendant also claims as error the trial court's refusal to instruct the jury as to the nontaxability of a damage award; to allow cross-examination of plaintiff's economist as to the nontaxability of an award; and, to allow defendant to introduce evidence as to the effects of income taxes on the decedent's future earnings. Numerous Federal cases have been cited by defendant and *amicus* American Trial Lawyers Association. From a review of these cases it is apparent that the Courts of Appeals differ on the question of whether it is proper to instruct the jury as to the nontaxability of an award or to allow evidence as to the effects of taxation on future earnings. Compare *Burlington Northern, Inc. v. Boxberger* (9th Cir. 1975), 529 F.2d 284, with *Johnson v. Penrod Drilling Co.* (5th Cir. 1975), 510 F.2d 234, *cert. denied* (1975), 423 U.S. 839, 46 L. Ed. 2d 58, 96 S. Ct. 68.

■■ The Supreme Court of the United States has not spoken on this issue. Absent an authoritative pronouncement by that court we will follow the decisions of our own supreme court in *Raines v. New York Central R.R. Co.* (1972), 51 Ill. 2d 428, 430, 283 N.E.2d 230, *cert. denied* (1972), 409 U.S. 983, 34 L. Ed. 2d 247, 93 S. Ct. 322, and *Hall v. Chicago &*

North Western Ry. Co. (1955), 5 Ill. 2d 135, 149-52, 125 N.E.2d 77, cited in *Saunders v. Norfolk & Western Ry. Co.* (1977), 54 Ill. App. 3d 307, 316, 369 N.E.2d 518. These decisions hold that it is not error to refuse to instruct a jury as to the nontaxability of an award. Based on these decisions we also conclude that it is not error to exclude evidence of the effect of income taxes on future earnings of the decedent. These contentions are therefore rejected.

We next turn to the issues raised by defendant concerning damages. The decedent is survived by his wife and four minor children, two of whom are from a previous marriage. These latter two are twin girls and were 16 years old at the time of the occurrence. The remaining two children are both boys, one 3 years old and the other 4½ months old at the time of decedent's death.

The decedent was 37 years old and was earning approximately $13,000 per year. Increases would have raised his earnings to about $16,800 per year by 1977. The plaintiff's economist fixed the present value of the future loss to the decedent's family at $302,000. He used a life expectancy of roughly 34 years for the decedent. The economist was unable to value the elements of rearing, training, instruction, advice and guidance of the decedent's children. He knew of no statistics for placing a monetary value upon these elements.

The defendant claims that it was error for the trial court to instruct the jury that it could award damages for the pecuniary value of any loss to the children of "care, attention, instruction, training, advice, and guidance" (IPI Civil No. 160.15), when no evidence of the value of such factors had been introduced. The defendant cites only one case in support of this proposition, *Petition of United States Steel Corp.* (6th Cir. 1970), 436 F.2d 1256, *cert. denied* (1971), 402 U.S. 987, 29 L. Ed. 2d 153, 91 S. Ct. 1665. That case, however, was not concerned with the amount of evidence produced. The question there was whether *any* award for loss of guidance could be granted to the wives and adult children of the decedents. In that sense it is distinguishable from the case at hand.

■■ The law in Illinois as to the sufficiency of the evidence to support an award for care and guidance is stated in *Allendorf v. Elgin, Joliet & Eastern Ry. Co.* (1956), 8 Ill. 2d 164, 180, 133 N.E.2d 288, *cert. denied*, 352 U.S. 833, 1 L. Ed. 2d 53, 77 S. Ct. 49:

> "* * * we are of the opinion that it is unnecessary to undertake to prove the value of the financial loss of such care, etc., anymore than it would be necessary to prove the value of pain and suffering or of inconvenience and annoyance when they are elements of damages. The jury should assess the value of such loss in the exercise of their best judgment based upon the facts of each case."

This decision has been followed in this court. *Lambdin v. Walter* (1968), 91 Ill. App. 2d 273, 233 N.E.2d 435; *Dodson v. Richter* (1962), 34 Ill. App. 2d 22, 180 N.E.2d 505.

■■ The jury was presented with ample evidence of the care and guidance rendered by the decedent to his children prior to his death. There was evidence that the decedent was a family man who neither drank nor gambled. The record contains numerous references to his relation to his family. These indicate that the decedent spent a great part of his free time helping around the house and teaching the children needed skills. In addition, since the survivors of the decedent are his lineal kinsmen, a "presumption of pecuniary loss obtains from the relationship, alone, sufficient to sustain a verdict and judgment awarding substantial damages, without proof of actual loss." (*Baird v. Chicago, Burlington & Quincy R.R. Co.* (1976), 63 Ill. 2d 463, 471, 349 N.E.2d 413, quoting from *Howlett v. Doglio* (1949), 402 Ill. 311, 316, 83 N.E.2d 708.) The trial court properly left the determination of the value of these services to the jury.

The defendant's final assignment of error concerns the size of the award. The defendant claims that $775,000 is excessive in light of the testimony by plaintiff's economist that the present value of the decedent's lost earnings only amounted to $302,000. We do not agree.

The Illinois Supreme Court has stated that the "amount of damages to be assessed is peculiarly a question of fact for the jury, and if the jury was properly instructed on the measure of damages, a reviewing court should not substitute its judgment for that of the jury as to the sum to be awarded." (*Baird,* 63 Ill. 2d 463, 472-73.) A reviewing court must "carefully scrutinize the record to determine [if the award] is so large as to indicate passion and prejudice." *Baird,* 63 Ill. 2d 463, 473.

■■ As above stated, we believe the jury was properly instructed on the issue of damages, therefore our only task is to review the record to determine if the award was the result of passion and prejudice. After a thorough review of the record we do not believe it was.

Plaintiff's economist testified that he based the computation of lost earnings on a "conservative" estimate of future increases in the decedent's salary. Also, the projection by the economist did not include any amount for the loss of care and guidance to decedent's four children. Two of these children were under 5 years of age and will require substantial attention throughout the years of their minority. Each of these factors may have carried considerable weight in the deliberations of the jury. See *Allendorf,* 8 Ill. 2d 164, 179-80.

Furthermore, the trial court denied the defendant's motion for a new trial, or, in the alternative, for a substantial remittitur. Defendant had urged that the verdict was so grossly excessive as to indicate that the "deliberations of the jury were tainted by improper or prejudicial

consideration." The trial court was in a better position than is this court on review to determine whether the jury was moved by passion and prejudice. *Scully v. Otis Elevator Co.* (1971), 2 Ill. App. 3d 185, 201, 275 N.E.2d 905.

This court has previously upheld verdicts of similar magnitude. In *Scully,* this court upheld an award of $600,000 to a widow and two minor children. The testimony in that case showed the present value of the decedent's lost earnings in 1962—the year of the accident—to be $209,000. In the case before us, the present value of decedent's lost earnings was almost $100,000 more than in *Scully;* there are two more children here than in *Scully;* and almost 7 years have gone by since *Scully* was decided during which time inflation has greatly reduced the value of the dollar. Given these differences, we cannot say that this award is excessive absent any specific indication of passion and prejudice in the record.

For the foregoing reasons the judgment of the trial court is affirmed.

Judgment affirmed.

O'CONNOR and BUCKLEY, JJ., concur.