DAVID OLTERSDORF, Plaintiff-Appellee, *v.* CHESAPEAKE & OHIO RAILROAD COMPANY, Defendant-Appellant.

First District (1st Division)   No. 78-1828

Opinion filed March 24, 1980.—Rehearing denied April 28, 1980.

Lord, Bissell & Brook, of Chicago (Alvin E. Domash, Hugh C. Griffin, and Patricia Foy Cross, of counsel), for appellant.

Robert E. Harrington and John J. Naughton, both of Chicago (Harrington & Harrington, Ltd., and Henslee, Monek & Henslee, of counsel), for appellee.

Mr. PRESIDING JUSTICE GOLDBERG delivered the opinion of the court:

David Oltersdorf (plaintiff) brought this action under the Federal Employers' Liability Act, for injuries in the course of duty, against Chesapeake & Ohio Railroad Company (defendant). A jury awarded plaintiff $1 million. Defendant appeals.

In this court, defendant contends the trial court erred in refusing to give defendant's requested special interrogatories relating to the plaintiff's contributory negligence; in refusing to allow evidence of the impact of taxation on plaintiff's projected future lost earnings; in refusing to instruct the jury its award of damages was not subject to taxation; and, finally, the verdict is excessive.

On September 16, 1974, plaintiff was working as a member of a four-man crew employed by the defendant. Their assignment was to switch freight cars in and out of industrial plants at the "Kelsey-Hayes" switching area near Romulus, Michigan.

Kelsey-Hayes is a six-track switching area. The two main tracks there are called the northbound main and the southbound main. At the south end of Kelsey-Hayes, the four other tracks diverge to the west from the main tracks and run adjacent to the main tracks through the switching area. Moving east to west, the third track is known as the "new lead." It is used only for switching cars. The "new lead" ends at the north end of Kelsey-Hayes where it merges into the main tracks. The fourth and fifth tracks are called the "Kelsey lead" and the "environ lead," respectively. These tracks service the Kelsey-Hayes and Eaton Chemical industrial plants located northwest of the switching area. The sixth, westernmost

track, is called the "Barrett lead." It services the Buffalo Tank industrial plant, also located northwest of the switching area.

At 10 p.m. on September 16, 1974, the four-man crew, including plaintiff, reported to work at defendant's railroad yard in Wayne, Michigan. Plaintiff was a brakeman, or "fieldman." Paul Laisure was the engineer. Lewis Burghardt was conductor and Alfred Long was the headman.

Burghardt was in charge of the switching operations and of all the movements of the train and crew. Plaintiff described the conductor as the "foreman" of the crew. Laisure operated the engine. Long, the headman, was responsible for relaying signals between the engineer and the rest of the crew and for hooking the engine on and off various cars during switching operations. As fieldman, plaintiff's duties were to ride in the caboose with the conductor. When the crew was conducting switching operations, plaintiff would be stationed on the ground at the rear of the train. He would assist in the switching of cars and operating the hand brakes on cars which were unhooked or "cut" from the train.

Plaintiff testified the crew left the Wayne, Michigan railroad yard with an engine, 17 boxcars and a caboose. Plaintiff was riding in the caboose with Burghardt. The train stopped at the Romulus, Michigan, depot. Plaintiff picked up switching orders assembled by one of defendant's agents from directions given to him by the three plants serviced from Kelsey-Hayes. Plaintiff gave Burghardt the orders, gave a copy of them to Long and kept a copy for himself. The train left Romulus on the southbound main track heading for Kelsey-Hayes. Plaintiff's best recollection was he rode in the caboose with Burghardt and Long rode in the engine with the engineer. Burghardt carried a "walkie-talkie" and there was a radio in the engine. There was no communication between the caboose and the engine during the 5-minute ride from Romulus to Kelsey-Hayes.

Plaintiff stated he discussed the switching work to be done with Burghardt on the way to Kelsey-Hayes. Burghardt told plaintiff he planned to release or "cut" the engine from the remainder of the train and leave the 17 boxcars and the caboose on the southbound main track. Burghardt would then take the engine to the new lead track, the next track to the west. There, he would connect nine cars to the engine. The nine cars were already standing on the new lead as part of a longer train. From front to rear these cars were four boxcars, two tank cars, two more boxcars and a flatcar. Burghardt told plaintiff they would then pull out the nine cars, put the flatcar on the Barrett lead, the farthest track to the west, put the next two boxcars back on the new lead, and then put two tank cars on the Barrett lead. The four boxcars left on the train would be connected to the remaining cars on the new lead and then "doubled up" with the

boxcars remaining on the southbound main track which the crew had brought from Wayne. All these cars would then be taken to the Kelsey lead, west of the new lead, and pushed into the Kelsey-Hayes plant.

When the train arrived at Kelsey-Hayes, the engine was detached from the 17 boxcars and caboose. They were left standing on the southbound main as Burghardt had said. Burghardt alighted from the caboose and uncoupled nine cars on the new lead from the other cars there. The engine was then brought to the new lead and attached to these nine cars which Burghardt had just "cut." Plaintiff testified that at this point, Long, the headman, asked Burghardt "what he had in mind". Burghardt repeated to Long, as Burghardt had previously told plaintiff in the caboose, about these nine cars. The crew was to take the flatcar to the Barrett lead, the 2 boxcars back to the new lead, the 2 tank cars to the Barrett lead, and then they would double up the remaining cars with the 17 boxcars which remained on the southbound main track, all to be taken to the Kelsey lead.

Plaintiff's testimony as to what happened up to this point was contradicted by Burghardt and Long. These witnesses testified that on the trip from Romulus to Kelsey-Hayes, plaintiff was not in the caboose with Burghardt but was riding in the engine with Long, the headman, and the engineer. Plaintiff's counsel virtually conceded this fact in his closing argument. Both witnesses also testified that while plaintiff received the switching list at Romulus, he did not give it to Burghardt until the train arrived at Kelsey-Hayes. Burghardt testified he did not communicate by radio with anyone in the engine during the trip from Romulus. However, Long stated plaintiff did converse with Burghardt on the radio. Plaintiff told Burghardt he had received the switching list "and went over a few things on the list." Long could not recall any more of the conversation.

Burghardt testified that after he reviewed the switching list, he told plaintiff and Long they would take the first 9 cars off of the train on the new lead, put the flatcar into the Barrett lead, put the 2 boxcars and 2 tank cars back into the new lead, and then take the remaining 4 boxcars and connect them to the 17 cars they had brought from Wayne. Burghardt specifically denied he ever told plaintiff he was going to put the two tank cars on the Barrett lead. Burghardt stated his intention was to put another flatcar (which he claimed was on the train they brought from Wayne) on the Barrett lead. He testified putting the tank cars on the Barrett lead would be "totally contrary" to his method of switching. This would require him to handle the tank cars at least one more time to get them out from between the flatcars and on to the Kelsey lead where they would be pushed into the Eaton Chemical plant.

Long testified he could only remember Burghardt telling plaintiff and

himself that the flatcar at the rear of the nine cars on the new lead had to go to the Barrett lead.

Events which transpired after the conversation between plaintiff, Burghardt and Long at Kelsey-Hayes are basically undisputed. After the engine was coupled to the cut of nine cars on the new lead, it pulled these cars 1000 yards south on the new lead past the switch regulating entry into each track. The switch was then thrown so that the engine could "kick" the flatcar on the north, rear end of the train into the Barret lead, to the extreme west, as planned. The "kick" is a maneuver by which the engine begins to push the cars and the coupler pin is pulled to disconnect the cars from the engine. The engine is then stopped and the released cars continue to roll ahead on their own momentum.

The flatcar was kicked. Plaintiff boarded it and set the hand brake as the car rolled into the Barrett lead. Plaintiff then lined up the coupling mechanism on the flatcar so the next car to enter the track would couple with the flatcar.

After the flatcar was released, the engine went south past the switch once more. Burghardt reset the switch for the train to enter the new lead. As Burghardt was standing by the switch, he told Long, "I want two boxcars and two tank cars." Long stood at the rear of the train. He testified he interpreted Burghardt's directions as meaning he wanted two separate cuts of two cars each. He did not know where Burghardt intended to put the tank cars. Long uncoupled the last two boxcars from the two tank cars and the two boxcars were kicked into the new lead. When Burghardt saw only the two boxcars entering the new lead, he told Long, "Let the tank cars go, too." Long accordingly uncoupled the two tank cars and they were also kicked into the new lead. According to Burghardt, the time between these two kicks was 5 to 15 seconds. Burghardt did not know where plaintiff was at this time.

Meanwhile, plaintiff had left the flatcar standing on the Barrett lead and was walking toward the new lead track. As he walked, he could see the silhouettes of Long and Burghardt, and he also saw the two boxcars coming into the new lead. When plaintiff arrived at the new lead, he pulled the coupling pin on the southernmost stationary car which the boxcars were about to connect with. He did this to insure a clean connection. The boxcars coupled with the standing cars and plaintiff stepped across the rail to connect the air hoses between the coupled cars. Plaintiff stepped across the rail to connect the air hoses between the coupled cars. Plaintiff testified he could hear the engine "revving" to kick the two tank cars, but he thought they were being kicked into the Barrett lead. As plaintiff started to step out from between the boxcars, the two oncoming tank cars made contact and coupled onto the boxcars. The

resulting jolt caused plaintiff to fall between the boxcars. Plaintiff's right leg was partially severed below the knee by the wheel of one of the cars.

Neither Burghardt nor Long realized what happened until plaintiff asked for them to come over and help him. A tourniquet was applied to plaintiff's leg. At the hospital his leg was amputated just below the knee.

Plaintiff, Burghardt and Long further testified as to the customs and practices involved in switching operations. Burghardt testified it was not the usual custom and practice to lace or connect air hoses between cars while cars were in the process of being switched. Usually, the hoses on a cut of cars would be connected after the engine was attached to the cut and the cars were stretched out. However, plaintiff stated it was never his custom to wait until the engine was attached to the train to connect the air hoses. Long corroborated plaintiff's testimony. Long stated plaintiff performed a usual and customary act in lacing the air hoses as he did. Long noted that since those cars were going to be switched out, they were required to have air supply.

Plaintiff testified the usual custom and practice when a conductor wanted to switch four cars onto one track would be for him to ask for four cars and not to request two and two as Burghardt had done on the night of the accident. Plaintiff and Long had never heard Burghardt ask for a cut of four cars in that manner before the night of the accident. Burghardt stated he intended to put the four cars on the new lead, but he admitted that his manner of asking may have been confusing to plaintiff and Long.

Safety rules were introduced into evidence by both parties. Plaintiff introduced a rule from defendant's own book of safety rules. The rule states:

> "*Planning work.* To expedite switching the conductor or yard foreman will see that all members of the crew, including the engineer, when practical, are fully informed of the switching movement to be made as many moves in advance as possible thereby giving them an opportunity to be prepared for such movement.
>
> After other members of the crew have been informed of the sequence of switching movements to be made, changes should not be made unless those concerned have been fully informed of the changed conditions."

When asked if Burghardt had complied with this rule, Long answered, "Well, no."

Defendant introduced a safety rule applicable to switching operations from the "Chessie System Operating Rules" which states:

> "They [switchmen] must expect movement of trains, engines or cars at any time on any track in either direction."

Predicated upon these facts, it is our opinion the verdict as regards

the negligence of defendant is strongly supported by the evidence. This portion of the verdict is approved.

An actuarial expert called by defendant testified as to plaintiff's projected lost future earnings. The actuary calculated that, assuming a 5-percent annual increase in wages, an 18.5-year future work life and a 7-percent discount rate, the then present value of plaintiff's lost future earnings, after deducting the amount he would make in his present job as a security guard, was $327,369. This amount did not take into consideration any deductions for income taxes. Prior to this testimony, the trial court had granted plaintiff's motion *in limine* to exclude any evidence on the impact of taxation on lost future earnings. Defendant offered to prove that if Federal income taxes, State income taxes and railroad retirement taxes were considered in the calculations and the discount rate was lowered to 6 percent, the net lost future earnings would be $166,051. As already noted, the jury returned a verdict of $1 million.

The trial court also refused a defendant's instruction which stated:
> "In reaching your verdict, you will not increase the amount of your verdict by reason of federal, state or local income taxes, since the amount awarded to plaintiff is not taxable income to plaintiff within the meaning of these tax laws."

Since oral argument before this court on January 21, 1980, we have had the benefit of a decision by the Supreme Court of the United States in *Norfolk & Western Ry. Co. v. Liepelt* (Docket No. 78-1323, filed February 19, 1980), 48 U.S.L.W. 4132. *Liepelt* originated in the circuit court of Cook County. This court affirmed on appeal. (*Liepelt v. Norfolk and Western Ry. Co.* (1978), 62 Ill. App. 3d 653; 378 N.E.2d 1232, *appeal denied* (1978), 71 Ill. 2d 618.) *Liepelt* involved a wrongful death action under the Federal Employers' Liability Act (FELA). At trial, actuarial evidence was heard as to the lost future earnings of the decedent, which were calculated to be $302,000. The trial court there also refused to allow evidence of the impact of taxation on the lost earnings. In an offer of proof by defendant, an actuary calculated that the net amount of lost earnings, after consideration of the impact of Federal income taxes and making adjustments to the annual increase in wages and the discount rate, was $138,327. The trial court also refused to instruct the jury that "your award will not be subject to any income taxes, and you should not consider such taxes in fixing the amount of your award." *Norfolk & Western Ry. Co. v. Liepelt* (Docket No. 78-1323, filed February 19, 1980), 48 U.S.L.W. 4132.

At the time this court reviewed *Liepelt*, the United States Supreme Court had not decided these issues. Therefore, we followed the decisions of the Illinois Supreme Court thereon and affirmed the trial court. (See *Liepelt*, 62 Ill. App. 3d 653, 668-69.) However, the United States Supreme

Court reversed our decision and held that "the wage earner's income tax is a relevant factor in calculating the monetary loss suffered * * *" and "it was error to refuse the requested instruction in this case." The supreme court remanded the cause for further proceedings.

Plaintiff's counsel has attempted to distinguish *Liepelt* from the instant case. He contends *Liepelt* deals only with wrongful death actions under the FELA in which damages are limited to decedent's contributions to the surviving dependents. We find no merit to this contention and conclude the *Liepelt* decision controls this case.

There is no language in the opinion of the United States Supreme Court to indicate it is limited to wrongful death cases under the FELA. Furthermore, the court had previously granted *certiorari* on precisely these same issues on instructions in a personal injury action under the FELA where, as in the instant case, the plaintiff suffered the loss of a leg. *Chicago, Rock Island & Pacific R.R. Co. v. Rediker* (1977), 1 Kan. App. 2d 581, 571 P.2d 70, *cert. granted* (1978), 435 U.S. 922, 55 L. Ed. 2d 514, 98 S. Ct. 1483, *cert. dismissed* (1978), 435 U.S. 982, 56 L. Ed. 2d 76, 98 S. Ct. 1635 (pursuant to Supreme Court Rule 60).

■■ Therefore, we must apply the teaching of the United States Supreme Court in *Liepelt* to the case before us. We hold the trial court erred in refusing to allow evidence of the impact of taxation on plaintiff's lost future earnings and in refusing to instruct the jury its award of damages was not subject to taxation.

Under the view we take of the instant case, it is also necessary for us to pass upon the propriety of defendant's special interrogatories relating to plaintiff's contributory negligence which were refused by the trial court.

Under the FELA, "the fact that the employee may have been guilty of contributory negligence shall not bar a recovery, but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employee * * *." 45 U.S.C. §53 (1976).

In our opinion, the contradictory nature of the testimony in the instant case raised an issue of fact as to whether plaintiff exercised ordinary care for his own safety before and at the time of the occurrence. We conclude the issue of plaintiff's contributory negligence was properly left for the jury to resolve.

Defendant tendered two special interrogatories pertaining to the contributory negligence issue. They were:

"SPECIAL INTERROGATORY NO. 1.

Do you find that the plaintiff was guilty of contributory negligence which was a proximate cause of his injury?

Yes_____
No_____

## SPECIAL INTERROGATORY NO. 2.

"If you have answered the preceding question 'Yes', what portion or percentage of the plaintiff's negligence contributed to his injury?

_____."

The trial court rejected these special interrogatories on the theory they did not control the verdict. Defendant contends this was reversible error. It has long been the rule that "[t]he court is not required to submit a special interrogatory unless it relates to ultimate facts of such a character that it would control a general verdict." (*Springfield Coal Mining Co. v. Gedutis* (1907), 227 Ill. 9, 13, 81 N.E. 9; *Stephenson v. Air Products & Chemicals, Inc.* (1969), 114 Ill. App. 2d 124, 137, 252 N.E.2d 366, *appeal denied* (1970), 42 Ill. 2d 585.) Therefore, interrogatories of this type should necessarily be framed "for the purpose of controlling any general verdict that may be returned for the plaintiff." *Chicago & Alton R.R. Co. v. Harrington* (1901), 192 Ill. 9, 34, 61 N.E. 622.

Defendant argues the above special interrogatories would have been controlling on the ultimate issue of damages. We disagree. In the instant case, the jury was properly instructed as to how damages should be computed in event of contributory negligence (Illinois Pattern Jury Instructions, Civil No. 160.13 (2d ed. 1971) (hereinafter cited as IPI Civil)):

"If you find that plaintiff's injury was proximately caused by a combination of plaintiff's contributory negligence and negligence on the part of the defendant, then in assessing the damages you should proceed in the following manner: First, determine the amount of the plaintiff's damages without reference to the question of contributory negligence. Second, decide what proportion or percentage of the total combined negligence of both parties causing the injury consisted of the plaintiff's negligence. Finally, reduce by this proportion or percentage the amount of damages you would have awarded had the plaintiff's negligence not contributed to the injury."

█ If these two special interrogatories had been given there would be no possibility of ascertaining whether the above instruction was followed. The only fact that could be deduced from the answers to these interrogatories is the degree or percentage of plaintiff's contributory negligence, if any. We could not be aware of the amount of damages without reference to the question of contributory negligence. Without

knowledge of the jury's thinking on this point, the special interrogatories could not control "any general verdict that may have been returned for the plaintiff."

In addition, the defendant's first special interrogatory is improper in form. It fails to limit the inquiry of whether plaintiff was guilty of contributory negligence to "'before and at the time of the occurrence.'" (*Stephenson*, 114 Ill. App. 2d 124, 137, quoting IPI Civil No. 10.03.) Thus, the trial court properly refused to submit these interrogatories to the jury. See *Skinner v. Baker* (1978), 67 Ill. App. 3d 773, 786, 384 N.E.2d 1360, *appeal denied* (1979), 75 Ill. 2d 594.

For these reasons, the judgment appealed from is reversed and the cause is remanded for a new trial on the issue of damages only. In fixing the amount of plaintiff's damages, the jury will be required to determine if plaintiff was guilty of contributory negligence; and, if so, what proportion or percentage of the total combined negligence of both parties consisted of the plaintiff's contributory negligence.

Reversed and remanded with directions.

McGLOON and O'CONNOR, JJ., concur.