NANCY E. VAN HOLT *et al.*, Plaintiffs-Appellees, v. NATIONAL RAILROAD PASSENGER CORPORATION *et al.*, Defendants-Appellants.

First District (2nd Division)   No. 1—95—1265

Opinion filed September 3, 1996, *nunc pro tunc* July 30, 1996.

64

Lord, Bissell & Brook (Hugh Griffin and Hugh Balsam, of counsel), and Seyfarth, Shaw, Fairweather & Geraldson (Robert Joyce, of counsel), both of Chicago, for appellants.

Law Offices of Donald J. Nolan, of Chicago (Donald Nolan and William Jovan, of counsel), for appellees.

PRESIDING JUSTICE HARTMAN delivered the opinion of the court:

Plaintiff Nancy Van Holt sued National Railroad Passenger

Corporation (Amtrak) under the Federal Employers' Liability Act (FELA) (45 U.S.C. § 51 *et seq.* (1988)), and Chicago Union Station Company (CUS), under the common law for injuries sustained when she slipped and fell in a taxi and automobile parking tunnel at Union Station. Plaintiff's husband, Louis Van Holt, also brought an action against CUS for loss of consortium.

Following trial, a jury found in favor of plaintiff and against Amtrak and CUS in the amount of $3,050,000, and in favor of Louis Van Holt and against CUS in the amount of $100,000. The jury also found plaintiff 10% at fault for the accident. The judgments were entered accordingly, and post-trial motions were denied, with the exception of a setoff for medical expenses paid by defendants. Amtrak and CUS appeal, raising as issues for review whether the circuit court erred (1) in denying defendants' motion for judgment notwithstanding the verdict; (2) in allowing the testimony of plaintiffs' expert; (3) in excluding evidence relating to the absence of prior accidents; (4) in disallowing evidence of withholding taxes on plaintiff's future income; (5) in allowing recovery of damages for "loss of enjoyment of life" and "pain and suffering" under the FELA; (6) in excluding evidence of plaintiff's failure to, mitigate damages; and (7) in excluding evidence of plaintiff's right to long-term disability benefits provided by defendants. We affirm in part and reverse and remand, in part, for reasons later stated.

At noon on April 14, 1987, plaintiff, an Amtrak payroll supervisor, and Leonard Benes, another Amtrak employee, on their way to lunch, walked along an area of Union Station known as the taxi tunnel, where plaintiff was permitted to park her car. Plaintiff testified that she "slipped on a greasy, slimy slick spot" on the surface of the taxi tunnel, which was paved with cobblestones. She had been taking small steps and walking cautiously because it had been raining and the road was wet. The day was overcast, and the tunnel was very dark. Just before her fall, she turned around because she heard the "revving" of taxicab engines. After the fall, she saw dark, greasy substances on her skirt and her hands and noticed that greasy substances were dripping from the ceiling of the tunnel onto the pavement. She mentioned this to Benes.

Benes testified that he saw puddles of water and oil on the tunnel road that day. He did not see plaintiff fall because he was walking a few steps in front of her. He heard a scream, turned around, and saw her on the ground. Her shoes and keys were a few feet in front of her, her stockings were ripped, and her hands were oily and wet.

C. William Autro, general superintendent for Amtrak activities at Union Station, was responsible for operations management at

CUS, formerly a wholly owned subsidiary of Amtrak. Autro testified that the taxi tunnel was an underground driveway that allowed vehicles to drop off passengers at a lower level Union Station entrance. It was CUS' responsibility to maintain and repair the taxi tunnel roadway. The taxi tunnel was a very busy roadway; taxis "tend[ed] to leak a lot of oil."

Video evidence deposition testimony of Herbert Bitting was introduced at trial. Bitting, an Amtrak engineer, testified that he was responsible for the maintenance of Union Station in the years 1985 through 1987. Lighting in the taxi tunnel was provided through sewer grates and lights in the tunnel. He described the lighting as dim, but not dark; it was sufficient during overcast days. Bitting agreed that the taxi tunnel was old and decrepit and that water seeped through the roof and walls of the tunnel. Stalactites, icicle-shaped deposits of limestone that leached from the concrete, hung from the ceiling of the tunnel. Bitting said that when stalactites fell to the ground, they were removed every night. Bitting agreed, however, that someone could slip on the accumulation of drops from the stalactites during the day. Workers occasionally knocked down the stalactites with a pole for safety reasons. Weather permitting, the taxi tunnel was washed and cleaned every night.

Plaintiffs introduced into evidence an accident report prepared by an Amtrak investigative safety committee, whose goal it was to ensure a safe working environment. The committee consisted of a peer group that investigated workplace accidents and made recommendations to management to avoid further accidents. Benes, who was a member of the committee, prepared the accident report because he was present at the time of its occurrence.

The report stated: "The conditions of the driveway were terrible. Chuckholes, wet moist pavement, oily slimy roadbed and darkness make walk[ing] to anyone[']s car difficult." It also reported that the conditions made walking "treacherous" on rainy days and the oil slicks made the brick road "extremely dangerous." Benes testified that he did not know the extent of plaintiff's injuries at the time the committee prepared the report.

Michael Massie, a consultant in railroad practices, possessed of a degree in architecture, testified as an expert for plaintiffs. Massie had worked various odd jobs in the railroad industry and had designed parking lots for railroad facilities. He inspected the taxi tunnel in question, was of the opinions that the cobblestones made the surface of the road uneven, and that the roadway was not conducive for walking. When the roadway was converted to a combination road and parking lot, there was no adequate walking

surface. The oil and grease on the road created a hazard for people walking to their cars. Defendants' motion to strike the opinion testimony, on the ground that it related to a matter of common knowledge, was denied.

Massie explained that the taxi tunnel, originally built as a two-lane road, was converted so that one lane was used for parking. The cobblestone paving was not conducive to a parking area; a smooth, anti-slip surface, such as concrete or asphalt, should have been used to prevent oil from causing a slippery surface. In addition, the lighting should have been improved to enhance the visibility for walking.

There was additional testimony regarding the extent of plaintiff's injury and damages, including her permanent disability that prevented her from working, the numerous operations for her disc and back problems, and the disruption on her family life.

At the conclusion of the trial, the jury returned a verdict against defendants and in favor of plaintiff in the amount of $3,050,000. Because plaintiff was found 10% comparatively negligent, the recoverable damages were reduced to $2,745,000. The separate loss of consortium claim of plaintiff's husband was entered against CUS in the amount of $90,000.

Pursuant to section 2—1202 of the Code of Civil Procedure (735 ILCS 5/2—1202 (West 1994)), defendants moved for judgment notwithstanding the verdict or, in the alternative, for a new trial or a substantial remittitur. The circuit court denied defendants' post-trial motion, but granted a setoff of $54,000 for medical expenses. Defendants timely filed a notice of appeal.

I

Defendants first contend that they were entitled to judgment notwithstanding the verdict because plaintiff did not prove the cause of her fall, there was no evidence as to what the black substance was, and there was no evidence to show the substance was there for a length of time sufficient for notice.

A motion for judgment notwithstanding the verdict will be granted by the circuit court whenever all the evidence, when viewed in the light most favorable to the opponent of the motion, so overwhelmingly favors the movant that no contrary verdict could ever stand. *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510, 229 N.E.2d 504 (1967); *Tierney v. Community Memorial General Hospital*, 268 Ill. App. 3d 1050, 1054, 645 N.E.2d 284 (1994). A jury's verdict will not be set aside merely because different inferences and conclusions may be drawn from conflicting testimony. *Allstate Contractors, Inc. v. Marriot Corp.*, 273 Ill. App. 3d 820, 827, 652 N.E.2d 1113 (1995).

## A

■ As to plaintiff's asserted failure to prove a condition created by defendants to cause her fall, liability cannot be predicated upon surmise or conjecture respecting the cause of the injury. Proximate cause can be established only when there is a reasonable certainty that defendants' acts caused the injury. *Vance v. Lucky Stores, Inc.*, 134 Ill. App. 3d 166, 168, 480 N.E.2d 167 (1985) (*Vance*). If plaintiff fails to establish the element of proximate cause, she has not sustained her burden of making a *prima facie* case and a directed verdict is proper. *Vance*, 134 Ill. App. 3d at 168. Causation need not be shown by direct evidence, however, but may be established by facts and circumstances which, in the light of ordinary experience, reasonably suggest that defendants' negligence produced the injury. *Canzoneri v. Village of Franklin Park*, 161 Ill. App. 3d 33, 41, 513 N.E.2d 1103 (1987).[1]

Defendants rely upon *Kimbrough v. Jewel Cos.*, 92 Ill. App. 3d 813, 416 N.E.2d 328 (1981), and *Vance* to support their argument that plaintiff did not prove causation. In *Kimbrough*, plaintiff testified that she did not know what caused her to fall, but that there appeared to be grease spots on the ramp where she fell. The court stated that summary judgment was proper against plaintiff because she did not prove that a condition created by defendant caused her fall, the grease spots on the ramp did not appear to be where she was walking, and she never felt the grease to see if it was wet. *Kimbrough*, 92 Ill. App. 3d at 816, 818. In *Vance*, plaintiff sustained injuries as a result of falling at defendant's store while shopping. Plaintiff did not know what caused her to fall. In the absence of any evidence as to what caused plaintiff's fall, the court held that the circuit court properly granted defendant's motion for a directed verdict. *Vance*, 134 Ill. App. 3d at 169.

■ By contrast, in the case *sub judice*, plaintiff testified that she "slipped on a greasy, slimy slick spot" that was on the road where she was walking. The bricks on the road were wet and she was taking "very small steps" and walking "cautiously." After the fall, she had dark, greasy substances on her skirt and hands. She also noticed that greasy substances were dripping from the roof of the taxi tunnel onto the pavement.

---

[1]The same standards are applicable in plaintiff's FELA suit against Amtrak. Under the provisions of the FELA, railroads have a nondelegable duty to provide their employees with a safe place to work. Liability is imposed on the employer for injury to the employee caused "in whole or in part" by the employer's negligence. *Howes v. Baker*, 16 Ill. App. 3d 39, 44, 305 N.E.2d 689 (1973).

Viewing the evidence in the light most favorable to plaintiffs, the circuit court properly denied defendants' motion for judgment *n.o.v.* Plaintiff provided direct testimony that the greasy substance caused her fall, and there was circumstantial evidence in the form of the dripping substance from the roof and the substance found on her skirt and hands, which was more than sufficient evidence for the jury to conclude that this substance caused her fall.

## B

Defendants next claim that there was no evidence that the dark substance was on the road for a sufficient amount of time in order to have provided sufficient notice.

■ Whether defendant breached its duty to plaintiff is a question of fact for the jury. *Maschhoff v. National Super Markets, Inc.*, 230 Ill. App. 3d 169, 175, 595 N.E.2d 665 (1992). Liability will be imposed where a business invitee is injured by slipping on a foreign substance on business premises if (1) the substance was placed there by the negligence of the proprietor, (2) the proprietor's servant knew of its presence, or (3) the substance was there a sufficient length of time so that in the exercise of ordinary care its presence should have been discovered. *Maschhoff*, 230 Ill. App. 3d at 175.

Here, Autro, the general superintendent for Amtrak activities at Union Station, testified that the taxis in the tunnel "tend to leak a lot of oil." Bitting, an Amtrak engineer in charge of maintenance at Union Station, stated that the light in the tunnel was dim, water leaked through the walls and roof of the tunnel, and stalactites dripped from the roof and fell to the ground. He also acknowledged the possibility that someone could step on the accumulation of drops from the stalactites during the day. Although the taxi tunnel was cleaned every day, plaintiffs' expert testified that the cobblestone road in the tunnel was an inadequate walking surface and that the oil on the road created a hazardous condition for all pedestrians.

In *Miller v. National Ass'n of Realtors*, 271 Ill. App. 3d 653, 648 N.E.2d 98 (1994), plaintiff slipped on a piece of cardboard that was on a loading ramp while delivering beer kegs to Billy Goat tavern. Evidence was presented that there was always some type of debris or dirt present on the ramp. The court held that the perpetual dirt, debris, and slipperiness on the ramp, as well as evidence that others had complained of the situation, were sufficient to create a jury question on the issue of defendant's notice of the loose piece of cardboard. *Miller*, 271 Ill. App. 3d at 657.

■ The case *sub judice* is analogous to *Miller* because there was evidence here that defendants were aware the hazardous conditions

in the taxi tunnel persisted and yet took no remedial action. Viewing the evidence in the light most favorable to plaintiffs, it cannot be said that it so overwhelmingly favors defendants that no contrary verdict could ever stand.

The banana peel and lettuce leaf cases cited by defendants are inapposite because they do not involve recurring and persistent conditions, such as the dripping stalactites and the leaking oil of the taxis, which are present in the instant case. Similarly, the cases from other jurisdictions involving pedestrians who slip on oil in parking lots may be distinguished because here additional hazards were created by the cobblestone road and the drips of stalactite from the tunnel's roof. See, *e.g.*, *Whitmore v. Sears, Roebuck & Co.*, 89 Mich. App. 3, 279 N.W.2d 318 (1979).

The circuit court did not err in denying defendants' motion for judgment notwithstanding the verdict.

## II

Defendants submit that the circuit court erred in allowing the opinions of plaintiffs' expert, Massie, because some related to a matter of common knowledge and others were improper legal opinions.

■ Expert testimony is admissible if the proffered witness is qualified as an expert in a field that has at least a modicum of reliability, and the testimony will tend to assist the trier of fact to understand the evidence or determine a fact in issue. *Dotto v. Okan*, 269 Ill. App. 3d 808, 810, 646 N.E.2d 1277 (1995). At one time, expert testimony was inadmissible if it pertained to matters within the knowledge or experience of jurors, but the modern rule makes admissibility of such testimony determinable solely on the basis of assisting the trier of fact. M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 702.4, at 556 (6th ed. 1994). See also *Thacker v. UNR Industries, Inc.*, 151 Ill. 2d 343, 365, 603 N.E.2d 449 (1992); *Anderson v. Chesapeake & Ohio Ry. Co.*, 147 Ill. App. 3d 960, 975, 498 N.E.2d 586 (1986) (*Chesapeake & Ohio Ry.*). The admission of expert testimony is within the circuit court's discretion and will not be reversed on appeal absent an abuse of discretion. *People v. Mehlberg*, 249 Ill. App. 3d 499, 533, 618 N.E.2d 1168 (1993).

■ Defendants maintain that Massie's testimony regarding the uneven surface of the cobblestone road, the slickness of the oil, and the inadequate lighting conditions was inadmissible because it related to matters within the common knowledge of jurors. The only question, however, is whether the testimony aided the jury in understanding the evidence. Massie had a professional degree in architecture and had designed parking lots for railroad facilities. In

his opinion, the cobblestone surface of the roadway was not conducive to safe walking. Moreover, he believed that a smooth, anti-slip surface, such as concrete or asphalt, should have replaced the cobblestone road to decrease the likelihood of slipping on the oil that leaked from cars. These opinions could have assisted the jury in understanding the facts at issue. The circuit court did not abuse its discretion in allowing this testimony.

The second part of defendants' argument is that Massie improperly was allowed to render legal opinions.

After Massie gave his opinion that an anti-slip surface should have been used in the taxi tunnel, he was asked about his familiarity with the FELA. Defendants objected that he was not an expert in legal matters, but the circuit court overruled the objection. Massie responded that he had consulted on cases involving the FELA and railroad workers and that he was familiar with its rules and regulations. He added that he was familiar with the industry's safety and parking practices under the FELA. He stated his opinion, over defendants' objection, that the parking facility in the taxi tunnel did not provide railroad employees with a safe place to function or work. Massie then stated his opinion that, in terms of the employer's obligation to provide a safe place to work under the FELA, it made no difference whether the taxi tunnel was owned by Amtrak or CUS because CUS was a subsidiary of Amtrak and it had the capability of controlling the workplace environment. Defendants moved for a mistrial, which the circuit court denied. Massie concluded that if the surface of the roadway could not have been changed in April 1987, it never should have been converted to a parking facility.

Defendants cite *Coyne v. Robert H. Anderson & Associates, Inc.*, 215 Ill. App. 3d 104, 574 N.E.2d 863 (1991) (*Coyne*), in support of the proposition that Massie's legal conclusions improperly invaded the province of the jury. In *Coyne*, the testimony of plaintiff's expert went to the ultimate issue of fact in the case, whether defendant was a "person having charge of" the work. The court held that whether defendant was in "charge of" the work was a factual determination to be made by the jury and that the expert improperly invaded an area within the common knowledge of the average juror. *Coyne*, 215 Ill. App. 3d at 112.

Massie's testimony in this case did not concern an interpretation of the FELA; rather, it consisted of his opinion that the parking facility in the taxi tunnel did not provide railroad employees with a safe place to function or work. Although this opinion related to the ultimate issue of the case, defendants' negligence, this type of testimony has been allowed. See *Merchants National Bank v. Elgin,*

*Joliet & Eastern Ry. Co.*, 49 Ill. 2d 118, 122, 273 N.E.2d 809 (1971) (expert may testify to the ultimate issue in the case because the jury is free to reject that opinion).

With respect to Massie's testimony concerning the legal relationship of CUS and Amtrak, defendants have not shown how this testimony affected the outcome of the case (see *Atkins v. Thapedi*, 166 Ill. App. 3d 471, 477, 519 N.E.2d 1073 (1988)), especially in light of Autro's testimony that CUS was a wholly owned subsidiary of Amtrak.

The circuit court did not abuse its discretion in allowing the expert testimony.

## III

■ Defendants maintain that the circuit court erred in excluding evidence of the absence of any prior accidents in the taxi tunnel area.

Generally, evidence of the absence of prior accidents is proper only if the offering party lays a proper foundation by establishing that such absence took place under conditions substantially similar to those surrounding the accident sued upon. *Parson v. City of Chicago*, 117 Ill. App. 3d 383, 388, 453 N.E.2d 770 (1983) (*Parson*). This evidence is admissible to show lack of notice of a dangerous condition or that the situation was not hazardous. *Gallick v. Novotney*, 124 Ill. App. 3d 756, 759, 464 N.E.2d 846 (1984).

In *Parson*, the court held that the circuit court properly refused to allow testimony that 300 to 400 vehicles had travelled down a certain street and that there were no accidents, although some cars had hit a pothole that had caused an accident in that case. 117 Ill. App. 3d at 388-89. The court stated that evidence of absence of accidents has less probative value than evidence of previous accidents, usually involves generally unreliable negative evidence, and does not tend directly to prove absence of negligence. But see *Schaffner v. Chicago & North Western Transportation Co.*, 129 Ill. 2d 1, 40-41, 541 N.E.2d 643 (1989).

The *Parson* case is similar to the case *sub judice*. Here, the evidence of a lack of prior falls could hardly establish proper maintenance of the taxi tunnel, where there was undisputable evidence that water seeped through the roof and v ,lls, the road surface was made of cobblestones, and stalactites leache ᐟ from the concrete and dripped onto the ground, and taxicabs dep⸱ ᵗited oil on the road surface. Amtrak's Bitting himself acknowled; .d the possibility that someone could step on the accumulation of rops on the ground from the stalactites.

Although the circuit court would have been within its discretion to allow evidence of no prior accidents, it cannot be said that the court abused its discretion in barring this evidence. There was no error.

## IV

■ Defendants argue that they should have been permitted to introduce evidence of taxes to be withheld from plaintiff's future earnings.

Prior to closing argument, defendants moved *in limine* that damages for lost wages be limited to plaintiff's net wages, not her gross wages. The circuit court ruled that the evidence concerning wage loss would be gross earnings. Plaintiff's final salary at Amtrak was $50,800, with additional annual fringe benefits of $6,858. During closing argument, plaintiff told the jury to multiply the sum of these amounts by the expected remainder of her working life, 22 years, which equals $1,268,476. The jury awarded her $1,246,000 for future lost earnings.

The circuit court's ruling deprived defendants of a fair trial on the damages issues. The measure of damages in FELA cases are federal in character, even where, as in the present case, plaintiff joins her federal and common law action in one lawsuit. "The supremacy clause of the United States Constitution requires preemption of State laws or common-law standards which conflict with Federal statutes and the execution of their full objectives." *Argueta v. Baltimore & Ohio Chicago Terminal R.R. Co.*, 224 Ill. App. 3d 11, 19, 586 N.E.2d 386 (1991). Accordingly, federal evidentiary principles must be applied in the FELA claim.

In *Norfolk & Western Ry. Co. v. Liepelt*, 444 U.S. 490, 62 L. Ed. 2d 689, 100 S. Ct. 755 (1980), the United States Supreme Court held that it was error to exclude evidence offered to show the effect of income taxes on plaintiff's estimated future earnings in a FELA case. The Court stated: "It is his after-tax income, rather than his gross income before taxes, that provides the only realistic measure of his ability to support his family. It follows inexorably that the wage earner's income tax is a relevant factor in calculating the monetary loss ***." *Liepelt*, 444 U.S. at 493-94, 62 L. Ed. 2d at 693-94, 100 S. Ct. at 757. See also *Oltersdorf v. Chesapeake & Ohio R.R. Co.*, 83 Ill. App. 3d 457, 464, 404 N.E.2d 320 (1980).

In this case, Amtrak, the sole defendant in the FELA claim, should have been allowed to show the effect of income taxes on plaintiff's estimated future earnings. Plaintiffs' argument that taxes withheld do not always approximate actual taxes paid does not

persuade. In *Liepelt*, the Court explained that uncertainty in estimating future income-tax liabilities is not a sufficient reason to reject the introduction of such evidence. *Liepelt*, 444 U.S. at 494, 62 L. Ed. 2d at 694, 100 S. Ct. at 758.

The circuit court erred in barring this evidence, and Amtrak is entitled to a new trial on the issue of damages with respect to the FELA claim.[2]

## V

■ Defendants next contend that the circuit court erred in instructing the jury that they could award plaintiff damages for "loss of enjoyment of life" and "pain and suffering."

During the jury instruction conference, plaintiffs tendered Illinois Pattern Jury Instructions, Civil, Nos. 30.01, 30.04, 30.05, 30.06, 30.07 (3d ed. 1994) (hereinafter IPI Civil 3d), which stated:

> "If you decide for the plaintiff on the question of liability, you must then fix the amount of money which will reasonably and fairly compensate [her] for any of the following elements of damages ***:
>
> The reasonable expense of necessary medical care, treatment, and services received.
>
> Future lost earnings.
>
> Loss of a normal life.
>
> Pain and suffering.
>
> Whether any of these elements of damages has been proved by the evidence is for you to determine."

The jury awarded plaintiff, in part, $875,000 each for loss of a normal life and pain and suffering.

In the interpretation of a federal statute, the decisions of the federal courts are controlling on Illinois courts. *Golden Bear Family Restaurants, Inc. v. Murray*, 144 Ill. App. 3d 616, 619-20, 494 N.E.2d 581 (1986); *Arnold v. Babcock & Wilcox Co.*, 154 Ill. App. 3d 863, 870, 507 N.E.2d 218 (1987), *aff'd*, 123 Ill. 2d 67, 525 N.E.2d 59 (1988). In *Dugas v. Kansas City Southern Ry. Lines*, 473 F.2d 821, 827 (5th Cir. 1973), the court held that under the FELA, damages for loss of a normal life "are to be included as a part of pain, suffering, and inconvenience. It is not a factor to be separately measured as an independent ground for damages." In *Earl v. Bouchard Transportation Co.*,

---

[2]In cases brought under state law, gross earnings, not net, is the proper figure to use in computing earning capacity. *Exchange National Bank v. Air Illinois, Inc.*, 167 Ill. App. 3d 1081, 1091-92, 522 N.E.2d 146 (1988); *McCann v. Lisle-Woodridge Fire Protection District*, 115 Ill. App. 3d 702, 706-07, 450 N.E.2d 1311 (1983).

917 F.2d 1320, 1326 (2d Cir. 1990), a case brought under the Jones Act (46 U.S.C. § 688 (1982)), the court cited *Dugas* and explained that "no matter how [this] issue is decided, *** the result should have no effect on awards by a properly instructed jury." The court reasoned that damages for loss of a normal life are a compensable item to be included somewhere in the total damage award. Therefore, whether damages for loss of life are included in the damages calculated for pain and suffering, or are calculated separately, the total damages awarded by the jury should be the same. *Earl*, 917 F.2d at 1326-27.

In the case *sub judice*, the circuit court relied on *Smith v. City of Evanston*, 260 Ill. App. 3d 925, 936-38, 631 N.E.2d 1269 (1994), a case brought under state law, where this court held that the jury should be instructed to award damages for "loss of a normal life" as a separate element because it is less likely to be misunderstood than if it were included in the blanket category of "disability."

Although the damage award of $875,000 for loss of a normal life may not have been duplicative, upon retrial of the FELA claim against Amtrak, deference should be given to the federal character of this FELA suit and damages considered according to principles governing such actions. Accordingly, "loss of a normal life" should not be considered separately as an independent ground for damages.

## VI

■ Defendants identify error in the circuit court ruling that they could not present evidence of plaintiff's failure to mitigate damages by not losing weight and refusal to submit this issue to the jury, especially where plaintiffs opened the door to this issue.

Video evidence deposition testimony of Dr. James Ahstrom was introduced at trial. The transcript of the evidence deposition was attached to defendants' post-trial motion. In that deposition transcript, Dr. Ahstrom, an orthopedic surgeon, testified that he treated plaintiff, beginning in April 1987. He estimated that in June 1987, plaintiff weighed over 300 pounds. He performed a diskectomy and an inner body fusion on plaintiff in November 1987 to relieve pressure the disc was causing on the nerve. Following surgery, plaintiff "had a fair amount of discomfort" and continued to experience pain. Following an office visit about a month after surgery, Dr. Ahstrom described plaintiff as "doing pretty well" and all in all, "doing beautifully."

By February 1988, plaintiff had returned to work full time and had lost 85 pounds. In April 1989, additional surgery was performed on plaintiff to relieve pressure on the nerve. Following that surgery, she experienced better feeling in the left lower extremity, but she still needed medication for her pain. Dr. Ahstrom did not believe

that her condition would improve or that anything could be done to improve it. At some indeterminate time in the future, plaintiff's weight increased about 125 pounds. With regard to plaintiff's obesity, Dr. Ahstrom testified that when plaintiff was first hospitalized the hospital nutritionist gave her a weight reduction diet. Dr. Ahstrom also recommended that she lose weight. He believed that her weight problem made it difficult for her to get well and contributed to the unsuccessful results of her surgeries.

Prior to trial, the circuit court ruled that evidence of plaintiff's weight would not be allowed to establish liability in the case or to show that the operations were more difficult, but reserved ruling on whether it would be allowed to show a failure to mitigate. The court and the parties subsequently edited the deposition of Dr. Ahstrom for the purpose of determining which portions would be presented to the jury. The court ruled that evidence relating to plaintiff's weight would not be allowed to show her failure to mitigate because it was speculative. The court noted that it was unclear from Dr. Ahstrom's deposition whether the nutritionist was assigned to plaintiff because of her obesity or if it was common hospital practice to do so; whether she was prescribed a particular weight loss program and, if so, whether she followed it; and to what extent her weight limited her ability to recover from her injuries.

At trial, plaintiffs introduced the video evidence deposition testimony of Carol Gordon, which the parties previously edited by agreement. At the conclusion of that showing, defendants moved to reopen the deposition of Dr. Ahstrom because Gordon was permitted to testify via video deposition that losing weight would not have improved plaintiff's condition. The circuit court denied defendants' request, stating that it had not even read the deposition before it was played to the jury and defendants themselves agreed to the substance of the deposition presented to the jury. The court said that it would not change the posture of the case because defendants should have objected before the tape was played to the jury.

A party who procures, invites, or acquiesces in the admission of improper evidence cannot complain with respect to the admission of said evidence. *Hamrock v. Henry*, 222 Ill. App. 3d 487, 495, 584 N.E.2d 204 (1991). Here, defendants cannot complain of the evidence allowed in Gordon's deposition testimony where they acquiesced in its admission.

Under the FELA, a party has a duty to mitigate damages, and defendant is entitled to an instruction if there is record evidence to support it. *Brown v. Chicago & North Western Transportation Co.*, 162 Ill. App. 3d 926, 932, 516 N.E.2d 320 (1987). See also *Khatib v.*

*McDonald*, 87 Ill. App. 3d 1087, 1095, 410 N.E.2d 266 (1980) (Illinois law). In *Muller v. Lykes Bros. Steamship Co.*, 337 F. Supp. 700, 706 (E.D. La. 1972), *aff'd*, 468 F.2d 951 (5th Cir. 1972), the court held that plaintiff, who weighed over 300 pounds, failed to minimize damages when he discontinued treatment in a weight reduction program that was prescribed by his doctor for the express purpose of relieving stress on his injured knee. But, in *Kratzer v. Capital Marine Supply, Inc.*, 645 F.2d 477, 483 (5th Cir. 1981), the court rejected the argument that plaintiff, who was overweight, failed to mitigate his damages because he did not attempt to lose weight at his doctors' suggestion. The court distinguished *Muller* because Kratzer was not placed on a doctor-administered weight reduction program and was "glibly" told by his doctors to lose weight, although the benefits were uncertain. *Kratzer*, 645 F.2d at 483-84.

The present case is more analogous to *Kratzer*. It was unclear from Dr. Ahstrom's deposition whether the nutritionist was assigned to plaintiff because of her obesity or if it was common hospital practice to do so. Further, his testimony is unclear as to the benefits of any weight reduction. Finally, the testimony is obscure as to when plaintiff put on the additional weight, why her weight increased, and if she ever attended a weight reduction program.

The circuit court did not err in denying admission of this evidence and refusing to give the instruction.

## VII

■ Defendants' final argument is that plaintiff's right to receive long-term disability benefits should have been permitted in evidence. Alternatively, a setoff should have been ordered to reflect the value of the future benefits plaintiff would receive.

At the conclusion of plaintiffs' case in chief, defense counsel informed the circuit court that plaintiff had been approved for long-term disability benefits under an insurance policy covering Amtrak and CUS employees that would pay her 60% of her salary annually until she reached 66 years of age. The court ruled that the evidence would be excluded.

Defendants objected to this ruling in their post-trial motion, which attached the policy in question and an affidavit of Amtrak's director of compensation and benefits, who averred that plaintiff received $4,587.50 in benefits through June 1994 and would receive $1,825 per month "for as long as she remains disabled under contract provisions to [the] end of her 65th birthday."

Under the collateral source rule, a plaintiff may recover the full measure of damages, without setoff or credit, although she is also

compensated from an independent source such as insurance. *Clark v. Burlington Northern, Inc.*, 726 F.2d 448, 449 (8th Cir. 1984) *(Clark)*. In contrast, section 55 of the FELA provides that "in any action brought against [any] common carrier ***, such common carrier may set off therein any sum it has contributed or paid to any insurance *** that may have been paid to the injured employee *** on account of the injury or death for which said action was brought." 45 U.S.C. § 55 (1988).

Although the language of section 55 appears broad enough to swallow the collateral source rule, courts have limited its scope by focusing on the provision that the covered payments be made "on account of the injury." *Clark*, 726 F.2d at 450. A distinction is drawn between those situations where payments emanate from a fringe benefit, such as a retirement fund or a general hospital and medical insurance plan, and payments where the employer has undertaken voluntarily to indemnify itself against possible liabilities under the FELA. See *Clark*, 726 F.2d at 450 (and cases cited therein). The rationale underlying this approach is that an employer who voluntarily undertakes to indemnify itself against liability by payment into a fund for that purpose should not be penalized by permitting plaintiff a double recovery, whereas an employer who makes payments into a fund established for an independent reason, such as to provide the employee a fringe benefit, should not be entitled to benefit by setting off such amounts against his liability to the employee. *Clark*, 726 F.2d at 450.

In determining whether an amount is a fringe benefit, the important consideration is the character of the benefit received, rather than whether the employer is actually the source of the fund. *Clark*, 726 F.2d at 450. Guidance in making this determination may be found in the specific provisions of the benefits plan in issue. *Burlington Northern R.R. Co. v. Strong*, 907 F.2d 707, 713 (7th Cir. 1990).

In the instant case, it should be noted initially that defendants did not make a proper offer of proof at trial thereby enabling the circuit court to reach a correct decision. All supporting affidavits as well as the insurance policy were presented in their post-trial motion. Because the court was not adequately informed as to the substance of the proffered evidence at trial, the issue was not properly preserved. See *State Farm Fire & Casualty Co. v. M. Walter Roofing Co.*, 271 Ill. App. 3d 42, 45-46, 648 N.E.2d 254 (1995). Nevertheless, since the damages issues must be retried, the disability compensation question will be considered here.

Defendants' disability insurance policy stated, in pertinent part, that one of its purposes was

"for the Employer to use its benefits (which are not a collateral source because they are provided as an employment benefit at no cost to the employee) *to satisfy any liability for lost wages under F.E.L.A.* to a disabled or injured employee covered by this contract and for the Employer to avoid duplicate liability under both this contract and F.E.L.A." (Emphasis added.)

This policy language clearly demonstrates that defendants undertook to indemnify themselves against possible liabilities under the FELA. It does not appear that the fund was established for any independent reason.

Plaintiff maintains that defendants are entitled to set off only the premiums paid and not the benefits received. Section 55 allows a set-off for amounts "contributed or paid to any insurance." 45 U.S.C. § 55 (1988). Judge Friendly's oft-cited concurrence in *Blake v. Delaware & Hudson Ry. Co.*, 484 F.2d 204, 207 (2d Cir. 1973), explained that railroads are entitled to set off only the premiums, not what the premiums bought, except as allowed by "specific provision in the collective bargaining agreement." Here, there was no such agreement. Accordingly, Amtrak is entitled to a setoff for premiums paid under this long-term disability policy in the new trial for FELA damages.

For the aforestated reasons, that part of the judgment assessing liability against defendants and in plaintiffs' favor is affirmed; that part of the judgment assessing damages in the state-law claims against CUS is affirmed; and that part of the judgment assessing damages in the FELA claim against Amtrak is reversed and remanded for a new trial in accordance with the views expressed in this opinion.

Affirmed in part; reversed and remanded, in part, for a new trial against Amtrak on FELA damages only.

DiVITO and BURKE, JJ., concur.