230

(No. 93-CC-2240– )

RANDALL W. SHERMAN, Claimant, *v.* THE STATE OF ILLINOIS, Respondent.

*Opinion filed January 31, 1994.*

*Opinion filed December 18, 1998.*

NICOARA & STEAGALL (JOHN P. NICOARA, of counsel), for Claimant.

JIM RYAN, Attorney General (GREGORY T. RIDDLE, Assistant Attorney General, of counsel), for Respondent.

## OPINION

SOMMER, J.

This is a claim for personal injuries allegedly caused by a cable strung across a portion of a bicycle path at the Rock Island Trail State Park. The Claimant specifically pleaded ordinary negligence, and the Respondent has filed a motion to dismiss grounded on the Recreational

Use of Land and Water Areas Act. (745 ILCS 65/1 *et seq.*) That Act provides in pertinent parts:

"§3. Except as specifically recognized by or provided in Section 6 of this Act, an owner of land owes no duty of care to keep the premises safe for entry or use by any person for recreational or conservation purposes, or to give any warning of a natural or artificial dangerous condition, use, structure, or activity on such premises to persons entering for such purposes."

\* \* \*

"§6. Nothing in this Act limits in any way liability which otherwise exists: (a) For willful and wanton failure to guard or warn against a dangerous condition, use, structure or activity."

Thus, the Respondent's position is that, absent allegations of willful and wanton conduct, this claim must be dismissed. The Claimant has replied to the motion by citing several cases which he contends bar the Respondent from invoking the immunity of the Act in this instance; in the alternative, the Claimant has asked leave to amend his claim to plead allegations of willful and wanton conduct.

The Claimant's argument against the applicability of the Act is that the premises in question were and are "used for more than casual recreational purposes." The seminal case cited in support of that argument is *Miller v. United States* (7th Cir. 1979), 597 F.2d 614. *Miller* found that the Recreational Use of Land and Water Areas Act (745 ILCS 65/1 *et seq.*) had to be read *in pari materia* with a different State statute, the Campground Licensing and Recreational Area Act. (210 ILCS 95/1 *et seq.*) It held that the Licensing Act applied to areas that are maintained "primarily" for recreational purposes and that the Recreational Use Act was only available for lands which are used on a "casual basis" for recreational purposes. (597 F.2d at 616.) The *Miller* Court did not explain in its opinion *why* it believed the Licensing Act operated to the exclusion of the Recreational Use Act, and it was left to the 7th Circuit Court in a subsequent case to construct an explanation:

"The government asks us to reconsider our holding in *Miller* that landowners subject to the Licensing Act may no longer claim immunity from tort liability under the [Recreational] Use Act * * *. The government points out * * * that the two acts are not literally inconsistent, which is true but ignores their purposes. The [Recreational] Use Act, passed in 1965, was designed to encourage landowners to open up their property for free public recreation. By 1971, when the Licensing Act was passed, the state had become concerned about safety and health at recreational areas, whether or not operated on a user-fee basis, that contained facilities for overnight stays. The Licensing Act brought these areas under a detailed scheme of licensing requirements and other regulatory controls * * *. It would be odd if, having brought under the strict safety and health requirements of the Licensing Act a subset of the landowners who had been encouraged by the earlier [Recreational] Use Act to open their land to public recreation, the state wanted these landowners to continue to enjoy the almost complete immunity from tort liability conferred by that act. . . . Since the Licensing Act contains no provisions relating to tort liability at all, it may reflect a preference for a regulatory over a common law system for preventing accidents in recreational areas. But *we imagine* that its overriding concern is safety, and so conceive the Act would be undermined if landowners subject to it continued to enjoy the tort immunity of the [Recreational] Use Act with its very different purpose of encouraging the opening of land for public recreation free of charge but at the price of some danger to the public. Also, the Licensing Act bespeaks concern for recreational areas where the landowner * * * has taken steps to encourage recreational uses by providing overnight facilities; and the fact that he has done so suggests he has the resources to protect users from safety hazards." *Davis v. United States* (7th Cir. 1983), 716 F.2d 418, 427-28. (Emphasis added.)

Illinois appellate courts subsequently adopted the *Miller* doctrine without scrutinizing its underpinnings. (See, e.g., *Logan v. Old Enterprise Farms, Ltd.* (5th Dist. 1989), 188 Ill. App. 3d 920, 544 N.E.2d 998 [later reversed by the Illinois Supreme Court on other grounds and issues at 139 Ill. 2d 229, 564 N.E.2d 778 (1990)], and *Phillips v. Community Center Foundation* (1st Dist. 1992), 238 Ill. App. 3d 505, 606 N.E.2d 447.) The issue raised in the instant case is whether the *Miller* doctrine is applicable to the Rock Island Trail State Park so as to bar the Respondent from claiming the immunity of the Recreational Use Act.

It must initially be emphasized that the *Miller* doctrine only relates to facilities that fall under the scope of

the Licensing Act. Section 4 of that Act specifically limits its application to "recreational areas that are campgrounds," and section 2 of the Act contains detailed definitions of operative terms such as "recreational area," "recreational activities," and "campground" which are critical to a determination of the threshold question: Is the Rock Island Trail State Park a "recreational area that is a campground?" Because neither party has addressed the point, the Court will presume for purposes of this opinion, without prejudice to the Respondent, that the park is in fact subject to the Licensing Act. However, were the Rock Island Trail State Park not actually governed by the Licensing Act, then the *Miller* doctrine would be irrelevant, and the Recreational Use Act's immunity would definitely come into play.

Hence, we move forward to directly address the viability of the *Miller* doctrine. Section 25 of the Licensing Act sets forth exceptions to application of the Act, and that section was recently amended by the General Assembly to include the following new text:

"Nothing in this Act shall be construed to impose any additional duty of care on an owner of land who either directly or indirectly invites or permits without charge, as defined in the Recreational Use of Land and Water Areas Act, any person to use such property for recreational purposes." See P.A. 85—959, section 4 (Laws of Illinois, 85th General Assembly, 1987 Session, Volume III, page 4287).

This amendment to section 25 of the Act became effective on December 8, 1987, and invalidated the *Miller* doctrine by striking at the very heart of the rationale which the 7th Circuit Court had used to support *Miller* in the later *Davis* decision. By specifically providing that the Licensing Act does *not* furnish a duty of care for purposes of tort liability, this amendment broadened the immunity available for landowners allowing free recreational use of

their land.[1] Thus, the Licensing Act is no longer "undermined" by the immunity set forth in the Recreational Use Act. Quite the contrary, it now expressly adopts and approves of the willful and wanton standard of care which the legislature, in all reality, probably never had intended to limit to so-called "casual" use facilities. In short, this amendment abolished the judicial construction that there was a distinction between areas maintained "primarily" for recreational purposes versus those used only on a "casual basis" for such purposes.

We find that the immunity set forth in the Recreational Use of Land and Water Areas Act is applicable to the present claim and that, as presently pleaded, this claim must be dismissed.

It is therefore ordered that the Respondent's motion to dismiss is allowed, and the claim filed herein on March 5, 1993, is dismissed. The Claimant is granted an additional thirty (30) days from the date of this opinion to file an amended complaint pleading facts which could or might satisfy the "willful and wanton" threshold for overcoming the Recreational Use Act's immunity.

## OPINION

SOMMER, C.J.

Claimant, Randall Sherman, brings this action against Respondent, State of Illinois, seeking damages for personal injuries suffered when he struck a cable while riding his bicycle on October 6, 1992, on the bicycle path of the Rock Island Trail State Park. Claimant's amended petition asserts that Respondent was guilty of one or more of the following willful and wanton acts or omissions:

---

[1] See page 43 of the November 6, 1987 Senate debates on this amendment as it appeared in House Bill 1421. Interestingly, at least one federal district judge thought that such was the case even after *Miller* and *Davis* but prior to this statutory amendment: "[T]he Licensing Act does not establish standards of care." *Hall v. United States*, 647 F. Supp. 53, 56 (Central Dist. Ill., 1986, Judge Baker).

"(a) Causing the aforesaid cable to be strung across the bike path when it knew or reasonably should have known that such cable would present a hazard to permitted and intended users of the path, after it knew or reasonably should have known that one or more other bicyclists had sustained a similar mishap by virtue of the same hazard;

(b) Caused such cable to be strung across the bike path without providing a means or method to make such cable visible to permitted and intended users of the bike path, after it knew or reasonably should have known that one or more other bicyclists had sustained a similar mishap by virtue of the same omission;

(c) Failed to give adequate warning by way of signs and barricades of the existence of said cable, after it knew or reasonably should have known that one or more other bicyclists had sustained a similar mishap by virtue of the same omission;

(d) Permitted said cable to remain across the path when it knew or reasonably should have known that said cable was present and that it presented a hazard to permitted and intended users of the bike path, after it knew or reasonably should have known that one or more other bicyclists had sustained a similar mishap by virtue of the same hazard."

The Rock Island Trail State Park is a 27-mile-long former railroad right-of-way that extends from Alta to Toulon and generally runs in a north-south direction. The path of the removed railroad tracks has been converted for walking, jogging and bicycling. For purposes of this decision the path shall be called the "trail." The trail is from eight to twelve feet wide and is limestone surfaced. Periodically, the trail crosses public roads. To prevent motor vehicles from entering the trail from the roads, Respondent constructed cable gates on each side of the road. The cable gates consisted of two six-inch by six-inch wood posts planted vertically into the ground. On each post there were red and orange reflectors nailed to both sides of the post. White PVC pipe was extended between the posts on the cable. Orange reflective tape was strung every so often on the PVC pipe. The cable was affixed to the posts at least on one side by a padlock which would allow Respondent's employees to temporarily take down the cable to permit service vehicles to enter the trail. There is an area to walk around the gates on the outside of the posts.

The portion of the trail Claimant was traveling on the day of the accident was from Alta to Princeville, a distance of ten miles. He was returning to Alta from Princeville when the accident occurred. There are 14 roads which cross the trail from Alta to Princeville. On each side of each road a cable gate blocked access to the trail. The cable Claimant struck while bicycling was located on the gate on the south side of Cedar Hills Drive.

Claimant testified that on October 6, 1992, he entered the trail of the Rock Island Trail State Park at Alta at 3:30 p.m. It was a warm, bright, overcast fall day. He bicycled from Alta to Princeville. Along the way he crossed Cedar Hills Drive. Upon reaching Princeville, he took a three to five-minute break and then started his return trip. As he approached Cedar Hills Drive he had to slow down to get around the cable gate on the north side of the road. After checking for traffic in both directions, he crossed the road, looked for another cable immediately, but did not see one. As he accelerated he looked up periodically, but did not see anything. Suddenly, the cable was in front of him and he did not have time to stop. He does not remember striking the cable.

After the impact Claimant believes he lost consciousness. The next thing Claimant remembered was awakening and finding a stranger with him. Claimant was lying on the ground and his bicycle was on its side with a flat tire. He could not recall his name and address. Another person who came upon Claimant after the accident loaded Claimant and his bicycle into his truck. Claimant was unable to recall the direction of his residence, but after riding in that direction his memory began to return and he was able to find his house.

After returning home, Claimant called his wife at her place of employment. She came home and took him

to Proctor Hospital where he spent four days. Claimant had suffered abrasions and a dislocation of his left shoulder, fractured ribs and a basilar skull fracture. After a twelve-day wait to permit his abrasions to heal, Claimant underwent an operation so that a screw could be inserted to bring the parts of the shoulder joint into proper alignment. This screw was removed in another procedure on December 1, 1992.

Claimant testified that the cable gates on the Rock Island Trail are usually ten to fifteen feet from the highway. He identified Claimant's exhibit 1 as photographs that he took on October 11 or 12, 1992, of typical road crossings of the Rock Island Trail. He testified that the location of his accident was the only site on his trip where the posts and cable were located approximately 200 feet off the road and back around a slight curve. He identified Claimant's exhibit 2 as a photograph he had taken on October 11, 1992, that shows the site of the accident. The cable was down and unsecured. He identified Claimant's exhibit 3 as a photograph of the accident site which he took on either October 11 or 12, 1992. The photograph shows the site from the direction Claimant was traveling when the accident occurred. The cable is up and secured in the photograph.

Claimant further testified he had been on the trail approximately a dozen times in the preceding three to four months. When he had ridden the trail prior to the accident, the cables from Alta to Dunlap were sometimes all up and sometimes all down. Occasionally, two or three would be up while the others were down. From the north edge of Dunlap to Princeville, the cables were always down. His accident occurred in the portion of the trail where the cables were randomly up or down.

On cross-examination Claimant testified he typically tried to get his bicycling in after work, and each time he

would enter the trail at Alta and usually would go as far as Princeville before returning. As he approached each cross road he would encounter a cable gate. The cable gates had an area that bikers and hikers would use to walk around the outside of the posts. After crossing the road he would encounter another cable gate. Each of the twelve times prior to the accident that he had traveled from Alta to Princeville and back he had encountered the gate where the accident occurred twice. If the cable was up he would take his bike around the post.

Claimant further testified on cross-examination that on the day of the incident he was riding a twelve speed, narrow-tired bike with handles that almost looked like ram's horns. His hands were on the portion of the handlebars that circle underneath so he could keep a grip on the brakes. When he accelerated he tucked his head down so that he was looking straight down for short periods of time. After he crossed Cedar Hills Drive he didn't see a gate so he started to accelerate and put his head down. About 50 or so feet later he looked up and didn't see anything in front of him. He then put his head down in the tuck position. Though he couldn't give an exact number of times he looked up before the accident, he knew it was more than twice. He identified Claimant's exhibits 5A and 5B as Polaroid pictures from Cedar Hills Drive to the gate where the accident occurred. The pictures were taken by his wife who later testified that she took the pictures on October 8, 1992. Exhibit 5B is a picture taken from the edge of Cedar Hills Drive looking south, which is the direction Claimant was traveling when the accident occurred. He testified he could not see a cable depicted in exhibit 5B. However, he could see something white that appeared to be crossing the path.

Claimant also testified on cross-examination that he was nearsighted and was required to wear corrective

lenses for driving. He was not, however, wearing glasses on the day of the accident and never wore glasses the 12 previous times he was on the trail. When Claimant's attorney was later given leave to recall Claimant, Claimant testified that during the lunch break he recalled that on the day of the accident he was wearing prescription sunglasses.

Harold Deatheridge was called as a witness by both Claimant and Respondent. He is an employee of the Illinois Department of Natural Resources who started working at the Rock Island Trail State Park as a site technician in January of 1987. His duties include maintenance and repair of the trail. Mr. Deatheridge testified that the most popular access point to the trail is the Alta parking lot. From Alta to Princeville is considered the lower portion of the trail. He estimated that in 1992, the year of Claimant's accident, approximately twenty-thousand people used the trail and probably ninety percent of those people used the lower portion. He further testified that trail users probably consist of seventy-five percent bikers and twenty-five percent people on foot. Mr. Deatheridge admitted hearing of maybe four bicycling accidents on the Rock Island Trail involving cable gates. He could only specifically recall three of the incidents. One accident was the one involving Claimant. Another was an incident involving a Mr. Art Oakford who, in 1992, struck a post of a cable gate while daydreaming, but did not strike the cable. Mr. Deatheridge heard about a third incident involving an unknown individual who, in 1989, ran into a cable somewhere on the trail. Mr. Deatheridge did not believe there was an accident report made about the incident and didn't know whether the incident involved any personal injury or property damage. He also had no information that the person riding the bicycle could not see the cable.

Mr. Deatheridge was also unaware of any other accident involving bikers running into the cable where Claimant's accident occurred. Mr. Deatheridge was unaware of any complaints from people using the trail that they had difficulty seeing the cable where Claimant's accident occurred.

Robert Espeseth testified as an expert witness for Claimant. He is a Professor Emeritus from the University of Illinois Department of Leisure Studies, who at one time had been Chief of Planning for the Wisconsin State Parks. He has spent over 30 years in the design of bike trails. He recalled testifying in support of the Rock Island Trail State Park at a hearing held in Peoria in 1974. During the course of the inception and development of the trail he recalled Jerry Schaefer, the Regional Land Manager for the Illinois Department of Conservation, asking about his experience with trails in Wisconsin and some of the aspects of development and design. Mr. Schaefer was concerned about keeping vehicles off the trail and inquired as to the type of barriers that had been used in Wisconsin. Professor Espeseth related to him that in many cases barriers had not been used at all, but where they were used, they were either removable or they were hinge posts that would drop down. Cables, chains or other barriers were never used across the entire trail because of safety factors and the possibility of collision by bikers.

Professor Espeseth visited the trail in October of 1995, to examine the accident site. He was shown Claimant's exhibit 3, the blown-up photograph of the cable gate where Claimant's accident occurred, and asked whether that cable gate constituted a substantial and significant breach of the standards of good and safe design principles to be used on bicycle paths. He responded that there are other alternative methods of safe barriers, such

as use of removable posts, bollards, and hinge posts. Claimant's exhibits 13, 14 and 15 illustrate alternative barrier designs. Professor Espeseth was not familiar with any other trails that utilize either cables or chains for blocking access along a bikeway. He further testified that use of a cable is substantially more dangerous than use of a bollard because it completely blocks the access of bicycles and you have to go around the posts to continue traversing the trail. He also testified that the cable Claimant struck was difficult to ascertain because of coloration of the cable, a broken part of PVC cover, and mottled sunlight coming through the trees and leaves.

On cross-examination Professor Espeseth testified he estimated that fifteen to twenty thousand people a year probably used the trail. He also acknowledged that someone who was daydreaming could possibly run into the posts, bollards and hinge posts that he had indicated were alternative safe barriers. However, he thought the possibility of collision would be reduced by having openings along the trail rather than a complete blockage of the trail.

Professor Espeseth was not permitted to testify, consistent with his affidavit submitted in response to Respondent's motion for summary judgment, that the gating system used by Respondent was a willful and wanton breach of the standard of care because that opinion went to the ultimate issue in this claim. Claimant contends that the failure to allow the testimony was improper, citing *Zavala v. Powermatic, Inc.* (1995), 167 Ill. 2d 542, 658 N.E.2d 371, 212 Ill. Dec. 889. In *Zavala* the Supreme Court of Illinois determined that the trial court properly allowed an expert's opinion regarding the ultimate issue in the case, stating at 167 Ill. 2d 545, 658 N.E.2d 373, 212 Ill. Dec. 891:

"It has been settled for some time that expert opinion testimony on an ultimate fact or issue does not impermissibly intrude on the fact finder's rule. (*Merchants National Bank v. Elgin, Joliet & Eastern Ry. Co.* (1971), 49 Ill. 2d 118, 122, 273 N.E.2d 809.) That notion applies in both civil and criminal contexts in this State so long as all other requirements for the admission of expert testimony are met. (See generally *Freeding-Skolie Roll-Off Service, Inc. v. Hamilton* (1985), 108 Ill. 2d 217, 221, 91 Ill. Dec. 178, 483 N.E.2d 524; *People v. Pugh* (1993), 157 Ill. 2d 1, 24, 191 Ill. Dec. 10, 623 N.E.2d 255.) The reason: the trier of fact is not required to accept the expert's conclusion. *Merchants National Bank,* 49 Ill. 2d at 122, 273 N.E.2d 809; see also *Hamilton,* 108 Ill. 2d at 221, 91 Ill. Dec. 178, 483 N.E.2d 524; see generally Note, *The Admissibility of Expert Witness Testimony: Time to Take the Final Leap?,* 42 U. Miami L. Rev. 831, 896 (1988) (noting that Federal Rule of Evidence 704, which abolishes the ultimate issue rule, is based on notions that a jury, instructed on the deference to accord, functions best under full presentation and cross-examination of expert testimony)."

Claimant notes that Courts have routinely permitted experts to state opinions regarding standard of care and cites *Anderson v. Chesapeake & Ohio Railway Co.* (1st Dist. 1986), 147 Ill. App. 3d 960, 498 N.E.2d 586, 262 Ill. Dec. 262 and *Van Holt v. National Railroad Passenger Corp.* (1st Dist. 1996), 283 Ill. App. 3d 62, 669 N.E.2d 1288, 218 Ill. Dec. 762, as examples. In *Anderson*, plaintiff's expert witness was permitted to testify that a railroad crossing was "extrahazardous." In *Van Holt*, plaintiff's expert was permitted to testify that a work area was in violation of the Federal Employers Liability Act because it did not provide the railroad employee with a safe place to function or work. Claimant has not presented, and this Court has not found, a decision in which an expert was permitted to testify that a party's conduct was willful and wanton.

The decision in *Zavala* would appear to allow testimony regarding the ultimate issue of whether conduct was a willful and wanton breach of the standard of care. Professor Espeseth's testimony should therefore have been allowed. However, as noted in *Zavala*, the trier of fact is not required to accept the expert's conclusion.

William Kapitko, the site superintendent at Jubilee College State Park, was called as a witness for Respondent.

He was the site superintendent for the Rock Island Trail State Park and was involved in developing the bike trail. He testified that the post and cable system was erected so the trail wouldn't develop any more vehicular damage. He could not recall if the post and cable system was suggested by a landscape architect, if it was just something that was mutually agreed upon, or if it was something that had been observed that had been done on other sites throughout the State and currently still is. To his knowledge, cable gates also exist at the Hennepin State Trail, Rice Lake Fish and Wildlife Area, Anderson Lake Fish and Wildlife Area, Green River Conservation Area, Sand Ridge State Forest and at Jubilee College State Park. He had also observed bicycling activity at all those sites.

Mr. Kapitko further testified he was unaware of any other incidents involving a bicycle rider striking a cable other than Mr. Sherman. He also testified that depending on the time of day and position of the sun, other cables on the trail are in the shade besides the one where Claimant's accident occurred.

On cross-examination, Mr. Kapitko testified that, in regard to the recreational facilities using cable gates that he discussed on direct examination, the Rock Island Trail State Park and Jubilee College State Park were the only facilities where more than fifty percent of the people were bicycling. He further testified that the system of reporting accidents that was used relied upon support officers, emergency vehicles and what could be physically observed. He also testified Mr. Deatheridge had not told him about other accidents of which Mr. Deatheridge had some recollection.

A willful or wanton injury must have been intentional or the act must have been committed under circumstances exhibiting a reckless disregard for the safety of others, such

as a failure, after knowledge of the impending danger, to exercise ordinary care to prevent it or a failure to discover the danger through recklessness or carelessness when it could have been discovered by the exercise of ordinary care. (*Ziarko v. Soo Line Railroad* (1994), 161 Ill. 2d 267, 641 N.E.2d 402, 204 Ill. Dec. 178.) Claimant contends the testimony of Harold Deatheridge regarding prior accidents on the trail involving the gating system is sufficient to prove Respondent was put on notice of the dangerous conditions created by its gating system. Claimant asserts it is not necessary to prove that any accidents occurred at the exact location as the gate where. Claimant's accident occurred because the gates used throughout the trail are substantially identical. Claimant cites *Rucker v. Northfolk and Western Railway Co.* (1979), 77 Ill. 2d 434, 396 N.E.2d 534, 33 Ill. Dec. 145, for the proposition that all he needs to establish is a substantial similarity between the prior occurrences and the incident in question. The only other evidence presented by Claimant regarding possible notice to Respondent of a dangerous condition was the testimony of Professor Espeseth that during the inception and development of the trail he told Jerry Schaefer, the Regional Land Manager of the Illinois Department of Conservation, that cables, chains or other barriers were never used in Wisconsin across an entire trail because of safety factors and the possibility of collision by bikes. Claimant further contends that Professor Espeseth's opinion that the gating system used by Respondent was a willful and wanton breach of the standard of care should be considered as a separate basis for concluding that Respondent is liable for Claimant's injuries.

Respondent contends any accidents established by Mr. Deatheridge's testimony falls short of proving willful and wanton conduct on the part of Respondent. As noted by Respondent, of the thousands of people who used the

bike path prior to 1992, Respondent was only aware of Claimant's accident, the accident involving Art Oakford who ran into a post and not a cable in 1992, and an additional accident which occurred on the trail, supposedly in 1989, although there was no information regarding where the accident occurred, whether any personal injury or property damage occurred, or whether the individual riding the bicycle could not see a cable. Respondent asserts that if you take away Claimant's accident in 1992, because the willful and wanton conduct must occur prior to Claimant's accident, the only accidents involved are the Oakford accident and the 1989 accident. According to Respondent, the Oakford accident must be excluded from consideration because there was no evidence that Mr. Oakford ran into a cable. Therefore, the only accident left of which Respondent may have had notice was the accident Mr. Deatheridge heard about in 1989, although there was no report where on the trail the accident occurred, whether there was any personal injury or property damage, or whether the individual involved could see the cable. In response to Professor Espeseth's testimony that he was told by Jerry Schaefer that in Wisconsin they never used cables, chains or barriers across the entire trail because of safety factors and the possibility of collision by bikers, Respondent asserts that all Professor Espeseth was testifying to was that he told Mr. Schaefer he had never used the cable gates in Wisconsin, not that the use of cable gates somehow violated some accepted standard for bike paths.

At the close of Claimant's case, Respondent moved for a motion for directed verdict. A directed verdict should be entered only in those cases in which all of the evidence, when viewed in the aspect most favorable to the opponent, so overwhelmingly favors the moving party that no contrary verdict based on that evidence could ever stand.

(*Pedrick v. Peoria and Eastern Ry. Co.* (1967), 37 Ill. 2d 404, 220 N.E.2d 504.) The evidence that has been presented regarding Respondent's possible knowledge that its gating system presented a dangerous condition consisted of the testimony of Harold Deatheridge concerning prior accidents and the testimony of Professor Espeseth. This evidence, when viewed in the aspect most favorable to Claimant, would overcome the motion for directed verdict.

To prevail on the merits in this claim, Claimant must prove by the preponderance of the evidence that, by using its cable gating system, Respondent acted in a willful and wanton manner. Claimant must specifically prove that Respondent either knew or failed to discover its cable gates were dangerous through recklessness or carelessness. Claimant has failed to meet his burden of proof. The only evidence presented regarding Respondent's possible knowledge prior to Claimant's accident that the cable gates were dangerous was testimony about prior accidents by Harold Deatheridge and the testimony of Professor Espeseth that he informed Jerry Schaefer during the development of the trail that cable gates were not used in Wisconsin because of safety concerns. This Court agrees with Respondent that Mr. Deatheridge's testimony falls short of proving willful and wanton conduct. Except for Claimant's accident, Mr. Deatheridge had no knowledge that could be imputed to Respondent of any accident involving a cable gate where the alleged cause of the accident was the inability to see a cable. This Court agrees with Respondent that Professor Espeseth's informing Jerry Schaefer that cable gates were not used in Wisconsin did not put Respondent on notice that the particular cable gates Respondent would choose to use would be dangerous because a bicyclist would not see a cable. Claimant did not produce evidence that Respondent had received any complaints that people using the trail had difficulty

seeing the cable. Claimant also did not provide evidence showing that Respondent failed to discover its cable gates were dangerous through recklessness or carelessness.

The allowance of Professor Espeseth's opinion that the gating system used by Respondent was a willful and wanton breach of the standard of care also does not help Claimant meet his burden of proof because that opinion does not have to be accepted by the trier of fact. The record indicates thousands of bicyclists used the trail prior to Claimant's accident without a reported accident allegedly caused by the inability to see the cable at the gate where Claimant's accident occurred or any other gate on the trail. There wasn't any evidence produced that any accidents had occurred at any of the other State facilities where similar cable gates were used. Claimant had previously encountered the gate where the accident occurred when the cable was up without incident. On the day of the accident Claimant had encountered the gate on his way to Princeville before his return trip. Professor Espeseth's view that alternative methods of safe barriers could have been used that were safer than cable gates does not prove Respondent should have known its gating system was dangerous, especially when the volume of trail usage without accidents allegedly caused by difficulty seeing cables is considered along with the lack of complaints of difficulty seeing cables.

It is therefore the opinion of this Court that this claim be, and hereby is, denied.